UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------X

Sonny B. Southerland, Sr., individually and
as parent and natural guardian of Venus          99-CV-3329
Southerland, Sonny B. Southerland, Jr.,          (CPS)(LB)
Nathaniel Southerland, Emmanuel Felix,
Kiam Felix, and Elizabeth Felix,

                     Plaintiffs,

     - against -                          MEMORANDUM
                              OPINION AND
City of New York, Timothy Woo, J. Does 1-9,      ORDER

                     Defendants.

-------------------------------------------X

SIFTON, Senior Judge.

     Plaintiff Sonny Southerland, Sr. ("Southerland") commenced
this action, on his own behalf and on behalf of his children,
Venus, Sonny Jr., Nathaniel, Emmanuel, Kiam, and Elizabeth
("plaintiff children"), against defendants the City of New York
("City"), Timothy Woo ("Woo"), and John Does 1-9, seeking
compensatory and punitive damages for injuries allegedly caused
by a decision of the New York State Family Court, Kings County,
to remove Southerland's children from his custody.  Plaintiffs
allege in their amended complaint[1] that defendants are liable
under 42 U.S.C. § 1983 for violations of plaintiff's rights under

---

[1] Plaintiffs filed their amended complaint on November 22, 2002 through
appointed counsel, Michael G. O'Neill ("O'Neill").  Since April 2004, plaintiff
Southerland has been proceeding *pro se*.  O'Neill continues to represent the
plaintiff children, including Venus and Sonny Jr., who are no longer minors.  In
April 2004, this Court also appointed a guardian *ad litem* to represent the
children's interests.

the Fourth and Fourteenth Amendments.[2]  Presently before the

Court is defendants' motion for summary judgment pursuant to

Federal Rule of Civil Procedure 56.  For the following reasons,

defendants' motion is granted.

## BACKGROUND

The following facts are drawn from the parties' depositions,

affidavits, exhibits, and Local Rule 56.1 statements.  Disputes

---

[2] Plaintiffs allege nine claims under 42 U.S.C. § 1983:

(1) that Woo violated plaintiff parent's Fourth Amendment rights by
allegedly entering plaintiff's home without privilege, cause, or
justification;

(2) that Woo violated plaintiff parent's Fourth Amendment rights by
remaining in plaintiff's home after finding that other children expected to
be in the home were not on the premises;

(3) that Woo violated plaintiff parent's procedural due process rights
under the Fourteenth Amendment by removing the minor children from
plaintiff's home without a court order and in the absence of immediate
threat of harm to the children's life or health;

(4) that Woo violated the children's procedural due process rights under
the Fourteenth Amendment for reasons stated in (3);

(5) that the City is liable under 42 U.S.C. § 1983 "[s]ince the  the
removal of the minor children from plaintiff's home without a court order
in the absence of any immediate threat of harm to their life or health was
pursuant to the official policy of the City's Administration for Children's
Services . . . .";

(6) that Woo deprived plaintiff parent of his substantive due process
rights under the Fourteenth Amendment by lacking a reasonable basis for
removing the children from plaintiff parent's home without a court order;

(7) that Woo deprived the children of their substantive due process right
to be in the care and custody of their father and natural guardian for
reasons stated in (6);

(8) that the City is liable under 42 U.S.C. § 1983 since removal of the
children without a reasonable basis was pursuant to the City's official
policy;

(9) that high-ranking policy-makers within the City's Police Department
knew or should have known that failure to train police officers
accompanying ACS employees on home visits and investigations would result
in the deprivation of constitutional rights of New York City residents.

Plaintiff requests judgment against defendants, jointly and severally, in
addition to compensatory and punitive damages, and a statutory award of attorney's
fees and costs.

are noted.

On May 29, 1997, a school guidance counselor reported to the New York State Central Registry ("SCR") child abuse hotline that Ciara Manning, who was sixteen years old at the time,

> . . . is emotionally unstable.  Fa[ther] fails to follow through with mental health referrals.  On May 12, 1997, the ch[ild] swallowed a can of paint.  F[ather] failed to take the ch[ild] for medical attention.  Fa[ther] is unable to control or supervise the ch[ild].  She may be staying out of the home in an improper environment.

Def. Exh. A, Intake Report of Office of Children and Family Services Child Protective Services, May 29, 1997.  Ciara Manning is the daughter of plaintiff, Sonny Southerland, and Diane Manning.  On May 29, 1997, the report was transmitted to the Brooklyn Field Office of the Administration for Children's Services ("ACS").  Fritz Balan ("Balan"), an ACS supervisor, assigned ACS caseworker Timothy Woo to investigate the allegations in the report.

Woo immediately began an investigation based on the report. Because ACS had already opened a case with respect to Ciara's mother, Diane Manning, Woo looked at those files first.  Based on those files, Woo determined that Ciara had several younger siblings and that Ciara was reported to be living with her father, Sonny Southerland, in Brooklyn.[3]  Woo Affidavit ¶ 5; Balan Affidavit ¶ 4.  Woo contacted the school guidance counselor

---

[3] The Intake Report also locates Ciara at Southerland's apartment.

who had called in the report, and the counselor informed him that Ciara had swallowed paint at school, that she was being aggressive, was acting out, and expressing thoughts of suicide. According to Woo's notes from the telephone conversation with the counselor, the counselor had "problems trying to get fa[ther's] attention," and the "father did not approve of the place where [Ciara] was staying."[4]  Plaintiff's Exh. A, Woo's Notes from Telephone Conversation.

That same day, on May 29, 1997, Woo attempted to visit the Southerland apartment where he believed Ciara was residing. Since no one answered the door, he left a note with his contact information.  On May 30, 1997, Southerland telephoned Woo.  The parties dispute whether Southerland refused to permit Woo to visit the home during their telephone conversation.  Plaintiff Southerland described Ciara as a runaway who would not listen,

---

[4] The notes do not state where precisely Ciara was thought to be staying at the time of the call, nor for how long she had been staying at that location. Plaintiff Southerland testified that when he moved into the Brooklyn apartment, he expected Ciara to live with him, but since the age of 14 or 15, she had not resided at that apartment.  Plaintiff Children's Exh. F, Southerland Dep., pp. 135-136.  Southerland testified that she was a runaway and that he and Ciara had agreed that as long as she attended school, she could stay wherever she liked ("here and there"), and he would help her if she needed anything.  *Id.* p. 137 ("As long as she goes to school and gets a little education she has my support but I can't chase all over the city.").  Southerland also testified that he had obtained "maybe four or five" Persons in Need of Supervision ("PINS") warrants against Ciara, but she had never been adjudicated a Person in Need of Supervision.  *Id.* p. 97.

In their Rule 56.1 statements, the parties dispute whether the counselor also stated to Woo that despite numerous notes and calls to his home, Ciara's father refused to follow up on the recommendation of a mental health evaluation for Ciara.  Woo's notes from the telephone conversation do not state that the counselor made such a statement.  However, the Intake Report from Child Protective Services states that the allegations relate to "lack of medical care" and "lack of supervision," Def. Exh. A, Child Protective Services Intake Report, p.3, which the plaintiff children do not dispute.

*see* Woo Declaration, ¶ 8, and suggested he come down to ACS to discuss the investigation with Woo.

Southerland came to the ACS office later that day and, according to Woo and Balan, was "quite belligerent and confrontational." He stated that Ciara did not require psychiatric help, that "she was only acting the way she did to get attention." Woo Declaration, ¶ 10; Balan Declaration, ¶ 7. Southerland testified that he told Woo that Ciara had run away, that he had obtained PINS warrants against her, and advised Woo to speak with the school officials. Plaintiff's Exh. F, Southerland Dep., p. 139. Woo reported in his case notes that when he asked Southerland why he did not seek medical attention for Ciara, Southerland did not answer.[5] Def. Exh. B, Woo's Progress Notes of Case, p. 1. According to Southerland's deposition testimony, Southerland asked to speak with Balan, who told him that if he did not do as Balan asked, Balan would take Southerland's children away and he would never see them again.

---

[5] Southerland testified that after Ciara swallowed the paint, the school contacted him and gave him a medical referral. Southerland explained to the school officials that he could not force Ciara to go, but he would try his best. He testified that,

> I tried to get her to go. I remember talking to her on the telephone and she told me something about how she was going with her friend to . . . something, . . . so she couldn't keep the appointment and I said if you don't keep the appointment, then they're going to call ACS. She says well, she's going to see her friend, I said okay, then I guess we have to deal with it the way we have to deal with it and I informed the school, told them the same thing she told me and I think after that the school sent me a certified letter that they were notifying ACS, then I said, well maybe they can help, you know, I did all I can do.

Plaintiff Children's Exh. F, Southerland Dep., p. 172.

*Id.* p. 140. When Woo said he needed to make a home visit, Southerland responded, "as long as he notified me no problem." Plaintiff's Exh. F, Southerland Dep., p. 207. Southerland further states that Woo said he would call Southerland, but Woo never called again. Also during Southerland's visit at ACS, Woo explained the services that were available to assist Southerland and his children, such as family counseling, assistance obtaining food, furniture, or clothing. Southerland refused such assistance.

On June 2, 1997, Woo attempted to visit the Southerland apartment a second time. A woman answered the door and said that Southerland was not at home. On June 3, 1997, Woo again went to the apartment, heard noises inside, but no one answered the door. On June 4, 1997, Woo waited in the hall outside the apartment for several minutes until about 9:30 am, when Southerland came out of the apartment with five school-age children, Sonny Jr., Venus, Emmanuel, Nathaniel, and Kiam, and said he was taking them to school.[6] Southerland stated that he did not have time to talk because he had to take the children to school. Woo gave Southerland an ACS business card and informed Southerland that if he continued to be uncooperative, then ACS would seek court action. *See* Plaintiff's Exh. B, Woo's Progress Notes of Case.

---

[6] Woo wrote the children's names in his Progress Case Notes, suggesting that the children were individually introduced to Woo at that time.

On June 6, 1997, based on the directions of his supervisor,
Balan, Woo applied to Family Court for an order to enter the
Southerland apartment pursuant to Family Court Act § 1034(2).[7]
ACS policy is to investigate and assess the home environment of
the child named in a report of suspected abuse or maltreatment of
the type referred to in Section 1034(2) and of any other children
residing in the same home.  *See* Def. Exh. B, Child Protection
Services memo from Assistant Administrator Special Services for
Children, p. 5 (stating that "[l]ocal commissioners or Social
Services have been delegated the responsibility to investigate or
cause to be investigated reports of suspected abuse and
maltreatment of children . . . . The law also mandates that, if
necessary, such cases should be brought before the Family Court
for adjudication").  On the application, Woo listed Ciara and the

---

[7]  The Family Court Act § 1034(2) provides that:

Before a petition is filed and where there is reasonable cause to suspect
that a child or children's life or health may be in danger, child
protective services may seek a court order based upon:

(A) a report of suspected abuse or maltreatment under title six of article
six of the social services law as well as any additional information that a
child protective investigator has learned in the investigation; and

(B) the fact that the investigator has been unable to locate the child
named in the report or any other children in the household or has been
denied access to the child or children in the household sufficient to
determine their safety; and

(C) the fact that the investigator has advised the parent or other persons
legally responsible for the child or children that, when denied sufficient
access to the child or other children in the household, the child
protective investigator may consider seeking an immediate court order to
gain access to the child or children without further notice to the parent
or other persons legally responsible.

McKinney's Family Court Act § 1034(2).

children of Ciara Manning's mother, who were named in the open
case regarding Ciara's mother, but failed to list the names of
the children he had met with Southerland on June 4, 1997.[8]  The
Manning children, however, were not the children living in the
Southerland apartment.[9]  The Family Court issued the Order to
Enter the same day, June 6, 1997.

On the evening of June 9, 1997, Woo and another caseworker
entered the Southerland apartment with the assistance of officers
from the New York Police Department ("NYPD").  Woo determined
that there were six children between the ages of three and nine
residing in the apartment.  He listed their names as Venus, Sonny
Jr., Nathaniel, Emmanuel, Kiam, and Elizabeth Felix.  Soon after
beginning his evaluation of the home, Woo called his supervisor
on his cell phone, described his observations, and answered his
supervisor's questions.  Woo reported that the four boys slept on
the floor in one bedroom and the two girls slept on a cot in
another bedroom.[10]  The children appeared as though they had not

---

[8] Plaintiff children allege that the children residing at the Manning home
at that time were: Eric Anderson, then nearly 14 years old; Richy Anderson, then
nearly 11 years old; Felicia Anderson, then 10 years old; Michael Manning, then
nearly 9 years old; Miracle Manning, then nearly 8 years old; and Erica Anderson,
then approximately six months old.  Ciara's living arrangements at the time are
unknown.

[9] Plaintiff children note that the children in the Southerland home at that
time were: Sonny, Jr. and Venus, twins aged 9 at the time; Nathaniel, then 8 years
old; Emmanuel, then 7 years old; and Kiam, then 5 years old; and Elizabeth Felix,
then aged three.

[10] Southerland testified that the boys had bunk beds in their room, but they
preferred to sleep on yellow foam sleeping pads on the floor.  Plaintiff's Exh. F,
Southerland Dep., p. 187.  Ciara also had a bedroom in the apartment.  *Id.*

been bathed in days and their clothing was malodorous.[11]  In the

refrigerator, Woo found only beer, a fruit drink, and English

muffins.  Woo did not examine the contents of the kitchen

cupboards.[12]  The other caseworker observed that one child,

Venus, was limping because of a foot injury.  The child stated

that she had stepped on a nail.[13]  The caseworker concluded that

Southerland had not sought medical attention for her.  Woo

reported that the only light source in the bedroom area was from

a blank television screen.  Woo observed an electric lamp on the

floor, without a shade, connected to an outlet in the living room

by means of several extension cords along the floor.[14]  Woo

reported that another room contained stacks of electronic

equipment.[15]  Woo and his supervisor concluded that the

children's safety was threatened, and Balan directed Woo to

remove the children from the home.

---

[11] Southerland testified that he laundered the children's clothing about
once a week and bathed the children daily.  Plaintiff's Exh. F, Southerland Dep.,
pp. 212-16.

[12] Southerland testified that he purchased groceries on a regular basis.
Plaintiff's Exh. F, Southerland Dep., p. 181.

[13] Woo learned of the injury from the caseworker while they were at the
Southerland apartment, but he did not personally observe the child's wound during
the assessment of the home.  After the children's removal, he brought the child to
a hospital based on the instructions of a nurse at the agency that first examined
the children.  At the hospital, the wound was dressed and the child received a
tetanus shot.  Plaintiff's Exh. D, Woo Dep., pp. 35-37.

[14] The plaintiff children dispute Woo's characterization of the apartment's
lighting.  They cite Southerland's deposition testimony, in which he stated that
each room had a lamp plugged into a wall in each room.  Plaintiff's Exh. F,
Southerland Dep., pp. 189-92.

[15] The children admit that electronic equipment was stored in one room.

Woo and Balan state that various factors contributed to this
determination, including the seriousness of the original
allegation, which involved a suicide attempt by Ciara, a
teenager, Southerland's failure to seek medical assistance for
her after she swallowed paint, his apparent resistance to
allowing ACS to visit his home, and his refusal to accept any
services or assistance in obtaining food, furniture, or clothing
for the children.  Those facts, in addition to the conditions
observed in the home with respect to plaintiff children,
including lack of food, Southerland's failure to seek medical
attention for the child with the injured foot, lack of adequate
light, the dangerous use of multiple extension cords for the
electronic equipment, the children's dirty clothes, established
in Balan's and Woo's minds that Southerland could not parent the
children responsibly.[16]

In the early morning of June 10, 1997, at Balan's direction,
Woo carried out an emergency removal of the children from
Southerland's apartment.  Woo took the children to the ACS pre-
placement emergency shelter and arranged for emergency foster

---

[16] Plaintiff Southerland submits in opposition to defendants' motion a home
video labeled "Elizabeth's Third Birthday Party Before Removal."  The film is
dated June 8, 1997.  Elizabeth was born on June 9, 1994.  *See* Def. Exh. E, Amended
Petition Child Abuse Case, In the Matter of Sonny Southerland, Jr.  The children
were removed on the morning of June 10, 1997.  The birthday celebration on June 8,
1997, less than two days before removal, depicts several children playing and
dancing as music plays in the background.  They eat birthday cake.  Electronic
equipment is stacked against a wall.  One of the smaller children begins to cry
and Southerland picks her and tells her he will take care of her.  *See* Plaintiff
Southerland Exhibit, CD entitled "Elizabeth's Third Birthday Party Before
Removal."

care.  During the course of the investigation,[17] Woo also

interviewed Ciara Manning, who he found living with a friend.

She reported that her father had sexually abused her over the

course of eight years and threatened to kill her if she told

anyone.[18]  Also, after their removal, the Southerland children

told caseworkers that their father and a female companion,

Vendetta Jones, hit them with belts and other objects, causing

welts and bruises.[19]

On June 13, 1997, verified petitions pursuant to Article Ten

of the Family Court Act were filed in family court against

Southerland and Jones.  The petitions alleged that Southerland

had been abusing his daughter, Ciara, since she was eight years

old, and that the other children's "physical, mental or emotional

condition has been impaired or is in imminent danger of becoming

---

[17] Defendants do not state at which point Woo interviewed Ciara, whether
before or after removal.  The plaintiff children contend that the interview took
place after the removal.

[18] Plaintiff *pro se* Southerland has attached to his submission in
opposition to the motion an affidavit by Ciara Manning dated April 20, 2002,
in which she states that

I lied to Mr. Woo because I was angry with my father.

Later, I gave other statements and testified in Family Court on about
March 18, 1998 that my father, Sonny Southerland, had molested me.  All
my statements to that effect were not true.  My father has never
molested or abused me in any way.

Ciara Manning Affidavit, Exhibit to Sonny Southerland *pro se* submission
papers.

[19]  The plaintiff children note that information obtained by Woo after the
removal is not relevant to his determination to remove the children from the
Southerland apartment.  I consider these facts only insofar as they help explain
the results of subsequent family court proceedings.

impaired as a result of the failure of their parents . . . to exercise a minimum degree of care." Def. Exh. E, Petition. The petition also alleges that respondents did not provide adequate shelter, that the children were at risk of injury from dangerous conditions at home, that they were provided inadequate food and clothing, were subject to neglect of hygiene, untreated medical conditions, and failure to cooperate with the ACS investigation. On June 27, 1997, amended verified petitions included allegations that Southerland had used excessive corporal punishment on the children, including the use of broom sticks, exercise equipment, and other objects that caused welts and bruises. He allegedly punished the children for taking food without permission by hitting them. Respondent Jones allegedly hit the children with a Nike belt and the children had observed Southerland hit Jones on several occasions.

On July 1, 1998, after a five day trial, the Family Court determined that Southerland had engaged in excessive corporal punishment, abused and neglected his children, and had sexually abused his daughter Ciara. The Court ordered that the children remain in foster care. The Appellate Division, Second Department, affirmed these orders, and the Court of Appeals denied leave to appeal.

Prior Proceedings

A year later, in June 1999, plaintiff Southerland,

-13-

proceeding *pro se*, filed this complaint against more than 40

defendants for the allegedly wrongful removal of the children

from his custody by ACS in June 1999.  On February 1, 2000, this

Court granted defendants' motion to dismiss the complaint.

Plaintiff appealed, and in April 2001, the Second Circuit

affirmed in part, reversed in part, and remanded the action. The

Second Circuit agreed that this Court was precluded from "review

of the New York state family court decisions subsequent to the

seizure of Southerland's children." *Southerland v. Rudolph*

*Giuliani, et al.*, 4 Fed. Appx. 33, 37 (2d Cir. 2001). However,

the Second Circuit reversed this Court's dismissal of plaintiff

Southerland's complaint alleging claims under Section 1983 for

violation of his procedural and substantive due process rights

under the Fourteenth Amendment.[20]

The Circuit Court remanded the case, noting that

"[Southerland's] allegation that his children were abused in

foster care by Joyce Baldwin may state an additional due process

claim."  *Id.*  Because plaintiffs have not made this claim in

their Amended Complaint following the remand and Joyce Baldwin

---

[20] Regarding plaintiff Southerland's procedural due process rights, the
Circuit Court stated that "[w]e think that Southerland should be given an
opportunity to prove either that no emergency justified the seizure of the
children without a hearing or that the subsequent family court proceedings were
insufficiently prompt to pass constitutional muster."  *Southerland v. Rudolph*
*Giuliani, et al.*, 4 Fed. Appx. 33, 36 (2d Cir. 2001).
    Regarding plaintiff Southerland's substantive due process rights, the
Circuit Court found that "[a]t the least, Southerland's complaint alleges that
there was no reasonable basis for the seizure of his children."  *Id.*

and Saint Joseph for Children and Family Services[21] have been
dismissed as defendants in this action, I conclude that the
plaintiffs have abandoned this claim.

The Circuit's holding was limited to the claims brought
directly by Southerland because Southerland, as a non-attorney
parent, must be represented by counsel when bringing an action on
behalf of his children. *Southerland v. Rudolph Giuliani, et al.*,
4 Fed. Appx. 33, 36 (2d Cir. 2001)(citing *Cheung v. Youth
Orchestra Foundation of Buffalo, Inc.*, 906 F.2d 59, 61 (2d Cir.
1990)).[22] Subsequent to the remand, I appointed counsel to
represent Southerland and his children.  Through appointed
counsel, Michael G. O'Neill ("O'Neill"), plaintiffs filed an
amended complaint in November 2002, asserting the claims under
Section 1983 listed above.  The amended complaint named
caseworker Timothy Woo and the City of New York and added John
Does 1-9 as defendants.

In March 2004, Sonny, Jr. and Venus returned to live in
their father's home.

In April 2004, I granted O'Neill's request to withdraw as

---

[21] Saint Joseph for Children and Family Services is the social services
agency that placed the children in Ms. Baldwin's care.  The Second Circuit noted
that the due process claim based on the alleged abuse in foster care could be
directly made against Baldwin, who was entrusted with the care of the children,
and less directly against St. Joseph as the placement agency for foster care of
the children.  *Id* at 37.

[22] The Circuit Court noted that "[t]he children's claims for unreasonable
seizure would proceed under the Fourth Amendment rather than the substantive
component of the Due Process Clause." *Id* at 37, n.2 (citing *Kia P. v. McIntyre*,
235 F.3d 749, 757-58 (2d Cir. 2000)).

counsel for Southerland who elected to proceed pro se. Counsel continued, however, to represent the children. I also appointed a guardian *ad litem* to represent the children's interests.

In October 2004, Nathaniel was discharged from the juvenile justice system by the Office of Children and Family Services. Around the same time, Emmanuel was also discharged from a juvenile justice facility. Both boys returned to the Southerland home. Kiam and Elizabeth remain in foster care. ACS has petitioned to terminate Southerland's parental rights with respect to Elizabeth Felix.

On April 19, 2006, the City and the plaintiff children (through appointed counsel O'Neill) advised this Court that they had entered into a stipulation of settlement. On May 13, 2006, two of the children, Sonny Jr. and Venus, reached 18 years of age. Because the older children had reached majority before an infant compromise order was approved, and because they objected to the terms of the settlement, this Court denied the application for entry of an infant compromise order. Defendants now move for summary judgment.

## DISCUSSION

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.[23]

---

[23] Defendants argue in a letter dated November 2, 2006 that this Court lacks subject matter jurisdiction over all claims under the *Rooker-Feldman* doctrine. That doctrine provides that federal district courts do not have jurisdiction over suits "that are, in substance, appeals from state-court

**Summary Judgment Standard**

A court must grant a motion for summary judgment if the movant shows that "there is no genuine issue as to any material fact" and that "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(c). Summary judgment is appropriate "[w]hen the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."

---

judgments." *Hoblock v. Albany Bd. of Elections*, 422 F.3d 77, 84 (2d Cir. 2005); *see also Sindone v. Kelly*, 439 F.Supp.2d 268, 271 (S.D.N.Y. 2006). In 2005, the Supreme Court confined the doctrine to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 284 (2005). In light of *Exxon*, the Second Circuit has articulated requirements in order for the doctrine to apply:

> (1) the federal-court plaintiff must have lost in state court; (2) the plaintiff must complain of injuries caused by the state court judgment; (3) the plaintiff must invite district court review and rejection of that judgment; and (4) the state-court judgment must have been rendered before the district court proceedings commenced.

*Hoblock v. Albany Bd. of Elections*, 422 F.3d 77, 85 (2d Cir. 2005). *See also Philipps ex rel. Green v. City of New York*, 453 F.Supp.2d 690, 713 (S.D.N.Y. 2006) (identifying the first and fourth requirements as procedural requirements and the second and third as substantive ones).

As the Second Circuit has already held in this case,

> the *Rooker-Feldman* doctrine precludes federal court review of the New York state family court decisions subsequent to the seizure of Southerland's children, but it does not prevent a federal court from hearing claims that the plaintiff's constitutional rights were violated prior to the family court proceedings by the state's alleged failure to provide a pre-deprivation hearing or a prompt post-deprivation hearing, or by the allegedly unreasonable seizure of the children.

*Southerland v. Giuliani*, *et al.*, 4 Fed.Appx. 33, 37 (2d Cir. 2001).

In any event, even assuming that plaintiffs' claims arise out of the state court judgments, the fourth element of the doctrine is not met because the state-court proceedings had not ended by the time the district court proceedings commenced in June 1999. The Family Court issued its order that the children remain in foster care on July 1, 1998, the Appellate Division affirmed these orders in 2000, and the Court of Appeals denied leave to appeal in 2002. Because the state proceedings ended after the commencement of district court proceedings, the *Rooker-Feldman* doctrine is inapplicable. *See Philips ex rel. Green v. City of New York*, 453 F.Supp.2d 690, 714 (identifying one definition of state proceedings "ending" as "when the highest state court in which review is available has affirmed the judgment below and nothing is left to be resolved").

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Elec. Inspectors, Inc. v. Village of East Hills*, 320 F.3d 110, 117 (2d Cir. 2003). A fact is material when it "might affect the outcome of the suit under the governing law." *Id.*

The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir. 1987). In order to defeat such a motion, the non-moving party must raise a genuine issue of material fact. Although all facts and inferences therefrom are to be construed in the light most favorable to the non-moving party, the non-moving party must raise more than a "metaphysical doubt" as to the material facts. *See Matsushita*, 475 U.S. at 586; *Harlen Assocs. v. Vill. of Mineola*, 273 F.3d 494, 498 (2d Cir. 2001). The non-moving party may not rely on conclusory allegations or unsubstantiated speculation. *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 568 (2d Cir. 1990). In deciding such a motion the trial court must determine whether "after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

**Woo's Qualified Immunity Defense**

"Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." *Saucier v. Katz*, 533 U.S. 194, 200 (2001). The doctrine of qualified immunity provides "immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Id* at 200 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Because qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation," *id.*, qualified immunity questions should be resolved "at the earliest possible stage of litigation." *Id.* (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)) (internal quotations omitted).

In general, public officials are entitled to qualified immunity if (1) their conduct does not violate clearly established statutory or constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights." *Holcomb v. Lykens*, 337 F.3d 217, 220 (2d Cir. 2003) (citing *Weyant v. Okst*, 101 F.3d 845, 857 (2d Cir. 1996)). In order to defeat a qualified immunity defense, the plaintiff "must allege a deprivation of an actual constitutional right clearly established at the time of the events in issue."

*Id.* "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id* (quoting *Hope v. Pelzer*, 536 U.S. 730, 740-41 (2002)). In light of the test outlined above, "[t]he question of qualified immunity is separate from the merits of the underlying action." *Washington Square Post No. 1212 v. Maduro*, 907 F.2d 1288, 1292 (2d Cir. 1990)(citation omitted).

Under the doctrine of qualified immunity, "officials who act in ways they reasonably believe to be lawful . . . should not be held personally liable." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). "The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular [official] conduct." *Saucier*, 533 U.S. at 205. Immunity applies "if officers of reasonable competence could disagree" on whether the conduct at issue was unlawful. *See Malley v. Briggs*, 475 U.S. 335, 341 (1986).

I address Woo's qualified immunity defense for each claim separately.

Fourth Amendment Claims[24]

---

[24] Plaintiff children fail to state a Fourth Amendment claim in their Amended Complaint, despite the Court of Appeals comment that "[t]he children's claims for unreasonable seizure would proceed under the Fourth Amendment rather than the substantive component of the Due Process Clause." *Southerland*, 4 Fed. Appx. at 37 (*citing* Kia P. V. McIntyre, 235 F.3d 749, 757-58 (2000)). Rather, plaintiff children allege that Woo deprived them of their substantive due process right under the Fourteenth Amendment to be in the care and custody of their father and natural guardian because he lacked a reasonable basis for removing the children from plaintiff parent's home without a court order. Defendants correctly note that the plaintiff children's

Plaintiff children argue that Woo is not entitled to qualified immunity because he made false and misleading statements to the family court that resulted in the unlawful search of the Southerland home.  Plaintiff children allege that Woo's statements were knowingly and intentionally false and misleading because he knew or had reason to know that the children identified in his application were not the children living in the apartment; that the order was only requested for the purpose of complying with ACS policy; that Ciara was not living with her father; that the Manning children were not neglected or abused; and that Southerland had cooperated with Woo's requests to visit the home and speak with the children named in the application.

"[T]he issuance of a search warrant [by a neutral magistrate] creates a presumption that it was objectively reasonable . . . to believe that the search was supported by probable cause..." *Martinez v. City of Schenectady*, 115 F.3d 111, 115(2d Cir. 1997)(citing *Golino v. City of New Haven*, 950 F.2d 864(2d Cir. 1991)).[25]  In order to defeat the presumption of

---

reliance on the substantive due process rights under the Fourteenth Amendment is misplaced since they may state a claim under the Fourth Amendment.  *Conn v. Gabbert*, 526 U.S. 286, 293 (1999). In response to defendants' motion, plaintiff children now refer to the Fourth Amendment as a basis for their claims.  Accordingly, I proceed with the analysis of their substantive due process claims under the Fourth Amendment.

[25] A court order is the equivalent of a warrant in the child protective investigation context.  *See Tenenbaum v. Williams*, 193 F.3d 581, 602-03 (2d. Cir. 1999).

qualified immunity, ". . . the plaintiff must make a 'substantial preliminary showing' that the affiant knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit and that the allegedly false statement was 'necessary to the finding of probable cause'." *Golino*, 950 F.2d at 870(citing *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)).

Assuming for purposes of the qualified immunity defense that Woo made false and misleading statements to the family court judge in his application for an order to search Southerland's home, plaintiffs would still have to demonstrate that those statements were "necessary to the finding of probable cause," *Golino*, 950 F.2d at 870, for qualified immunity not to attach to Woo's actions. Under the "corrected affidavits" doctrine, it is appropriate to consider whether a properly made application, based on all existing facts known to Woo, would have been sufficient to support a finding of probable cause. *Martinez*, 115 F.3d at 115. "Only if the corrected affidavit would not support a reasonable officer's belief that probable cause existed would the identified factual disputes be material to resolving the issue." *Escalera v. Lunn*, 361 F.3d 737, 743-744 (2d Cir. 2004)(internal quotations and citation omitted).

In this case, a properly made application would still list Ciara Manning on the application because Southerland is her

father and was the parent legally responsible for her care, even
if she had run away. Ciara's suicidal thoughts, as expressed by
the swallowing of paint, and Southerland's refusal to seek
medical and psychiatric treatment for Ciara, would remain a valid
reason in Woo's application. Even if Woo's application falsely
stated that the allegations were based on his own personal
knowledge, a corrected affidavit stating that Woo had relied on
statements of school officials who are New York State mandated
reporters to support his belief that Ciara was suicidal would
have supported probable cause. In addition, even if Woo's
application falsely stated that Southerland would not allow ACS
into his home to speak with the children, a corrected affidavit
accurately describing Woo's telephone conversation and meeting
with Southerland in his ACS office, and Woo's repeated attempts
to visit the Southerland home in order to identify and evaluate
the other children in the Southerland home would have supported a
finding of probable cause. Further, a corrected affidavit that
stated the names of the Southerland children would still have
supported a finding of probable cause because Woo was required to
examine all of the children in the home of a family under
investigation. Therefore, viewing the evidence in the light most
favorable to plaintiffs, I conclude that a corrected affidavit
specifying all of the information known to Woo establishes an
objective basis that would have supported a "reasonable

[caseworker's] belief that probable cause existed." *Escalera,*
361 F.3d at 744. Accordingly, Woo is entitled to qualified
immunity on plaintiffs' claims that Woo's entry into and search
of Southerland's home violated their Fourth Amendment rights.

Turning to the children's claim of unlawful seizure, prior
to the Court of Appeals' decision in *Tenenbaum,* there was no
clear application of Fourth Amendment standards in the child
removal context. [26] *See Tenenbaum,* 193 F.3d at 605. Since the *ex
parte* removal of the Southerland children took place prior to the
*Tenenbaum* decision, "[t]here was no 'clearly established' law
under the Fourth Amendment from which [Woo] could have concluded
that [he] did not have 'probable cause' to remove [the children]
. . . on an emergency basis." *Tenenbaum,* 193 F.3d at 605.
Thus, qualified immunity shields Woo from plaintiff children's
claim that he unlawfully seized them from their home.

Substantive Due Process Claim

Plaintiff Southerland has a "substantive right under the Due
Process Clause [for his family] to remain together without the
coercive interference of the awesome power of the state."

---

[26] Plaintiff children attempt to distinguish the holding of *Tenenbaum v.
Williams* by arguing that *Tenenbaum* arose in the child abuse context whereas
this case stems from what was initially a neglect petition. Given that the
warrantless removal of children may occur as the result of any type of child
protective investigation, *see* New York State Family Court Act § 1024(a),
*infra*, the Court of Appeals holding in *Tenenbaum* is equally applicable to
child removals arising in the neglect context. *See also Nicholson v.
Scopetta,* 344 F.3d 154 (2d Cir. 2003)(stating that the Fourth Amendment
applies in the context of the seizure of a child by caseworkers during child-
abuse or maltreatment investigations).

*Tenenbaum*, 193 F.3d at 600 (citing *Duchesne v. Sugarman,* 566 F.2d 817, 825 (2d. Cir. 1977)).  Southerland's substantive due process rights were clearly established at the time of the removal of the children.  *See Joyner ex rel. Lowry v. Dumpson*, 712 F.2d 770, 778 (2d Cir. 1983).  Therefore, in order for qualified immunity to attach to Woo's actions, Woo must show that it was objectively reasonable for him to believe that he did not violate plaintiff's substantive due process rights by removing the children.

"Brief removals [of children from their parents] generally do not rise to the level of a substantive due process violation, at least where the purpose of the removal is to keep the child safe during investigation and court confirmation of the basis for removal."  *Nicholson,* 344 F.3d at 172 (citing *Tenenbaum,* 193 F.3d at 600-601 & n. 12).  Given that the children were removed in the context of a child protective investigation and the removal would be subject to court confirmation, it was objectively reasonable for Woo to conclude that Southerland's substantive due process rights were not violated.  Accordingly, Woo is entitled to qualified immunity on Southerland's substantive due process claim.

Procedural Due Process Claims

In 1997, when the events in this case took place, there was an absence of clearly established law regarding caseworker conduct during investigations.  *See Wilkinson v. Russell*, 182

F.3d 89, 107 (2d Cir. 1999).  The Court of Appeals observed in
*Wilkinson* that "courts had excused a broad array of alleged
investigative errors without even hinting at the particular
circumstances in which such errors might amount to a
constitutional violation."  *Id* at 109.

    Approximately two years after the events in this case took
place, the Court of Appeals articulated a standard for the
conduct of case workers during investigations, holding that
"where there is reasonable time consistent with the safety of the
child to obtain a judicial order, the 'emergency' removal of a
child is not warranted." *Tenenbaum*, 193 F.3d at 596.  Because the
law concerning procedural due process rights in the context of
child removals was not clearly defined at the time of the events
in question, Woo did not have a legal basis upon which to
conclude that his actions violated plaintiffs' procedural due
process rights.

    Accordingly, Woo is entitled to qualified immunity on all of
the claims of both sets of plaintiffs and summary judgment is
granted in favor of defendants on the qualified immunity defense.

**The Merits of Plaintiff's Claims**

    Even if defendant Woo was not entitled to qualified
immunity, summary judgment would still be appropriate on
plaintiff Southerland's Fourth Amendment and substantive due

process claims as well as on plaintiff children's claim of
unlawful search under the Fourth Amendment.

Fourth Amendment Claims

"The Fourth Amendment protects 'the people' from
'unreasonable searches and seizures,' also providing that 'no
Warrants shall issue, but *upon probable cause*, supported by Oath
or affirmation, and particularly describing...the persons or
things to be seized.'" *Tenenbaum*, 193 F.3d at 602.

Both sets of plaintiffs allege that Woo violated their
Fourth Amendment rights by knowingly and intentionally making
false and misleading statements in the Family Court application
for an order to enter the Southerland home. Viewing the facts in
the light most favorable to plaintiffs, Woo applied for an order
based on the information he had available to him at that time.
He had reason to believe that the Manning children would be found
in the Southerland apartment because of a separate investigation
of the Manning children and his personal observation that there
were other children in the Southerland home who had not yet been
positively identified, Plaintiff Children's Exh. B, Woo Dep., pp.
20-21; he had a statutory responsibility to investigate the well
being of the other children in the home because they were part
of a family already under investigation, Woo. Dep., pp. 21-22;
Southerland was still legally responsible for the care of his
daughter even if she had run away, Woo Dep., p. 17; and he had

reason to view Southerland as having been uncooperative with his efforts to visit the home and speak with the children, Woo Dec., ¶¶ 8-12. Accordingly, no reasonable juror could infer that Woo knowingly and intentionally made false and misleading statements to the family court in order to receive an order authorizing his entry into the Southerland home. Hence, the order was issued with probable cause and Woo's entry into and search of Southerland's home did not violate plaintiffs' Fourth Amendment rights.

Plaintiff Southerland also claims that once Woo determined that the Manning children were not in the home, Woo was required to leave and that by remaining in the house, Woo violated Southerland's Fourth Amendment rights. The Fourth Amendment only protects against unreasonable search and seizure and does not provide for the absolute protection of the home. Woo had a valid court order authorizing him to enter the Southerland home and once inside, he had a statutory obligation to identify and evaluate all the children in the home. *See* New York State Social Services Law § 424(6);[27] *Shapiro v. Kronfeld*, 2004 WL 2698889 *14

---

[27] New York State Social Services Law §424(6) states:

> Upon receipt of such report, commence or cause the appropriate society for the prevention of cruelty to children to commence, within twenty-four hours, an appropriate investigation which shall include an evaluation of the environment of the child named in the report and any other children in the same home and a determination of the risk to such children if they continue to remain in the existing home environment, as well as a determination of the nature, extent and cause of any condition enumerated in such report and the name, age and condition of other children in the home, and, after seeing to the safety of the child or children,

(S.D.N.Y. 2004). Thus, Woo did not violate Southerland's Fourth Amendment rights by remaining in the home after he discovered that the Manning children were not present.[28]

Accordingly, summary judgment is appropriate on both sets of plaintiffs' Fourth Amendment claims of unlawful entry and search of the Southerland home.[29]

---

forthwith notify the subjects of the report and other persons named in the report in writing of the existence of the report and their respective rights pursuant to this title in regard to amendment[.]

McKinney's Social Services Law § 424 (6).

[28] Plaintiff children also claim that once Woo determined that the Manning children were not present in plaintiff's home, Woo's privilege to enter plaintiff's home, if such privilege had ever existed, ended. Plaintiff Children's Opposition Memorandum, p. 11. However, plaintiff children do not provide any arguments in support of their claim. Nonetheless, under the same rationale by which I dismissed plaintiff Southerland's identical claim, I conclude that plaintiff children's Fourth Amendment rights were not violated by Woo on account of his remaining in the Southerland home once he determined that the Manning children were not present.

[29] In the absence of Woo's qualified immunity defense, plaintiff children's claim that Woo violated their Fourth Amendment rights by subjecting them to an unlawful seizure in the absence of a court order or imminent danger would withstand defendants' motion for summary judgment. Under the New York State Family Court Act, child protection workers are permitted to conduct ex parte removals of children if:

(I) such person has reasonable cause to believe that the child is in such circumstance or condition that his continuing in said place of residence or in the care and custody of the parent or person legally responsible for the child's care presents an imminent danger to the child's life or health; and (ii) there is not time enough to apply for an order under section one thousand twenty-two.

McKinney's Family Court Act § 1024(a). A warrantless seizure of a child is reasonable if it is justified by exigent circumstances, defined as having reason to believe that life or limb is in immediate jeopardy. *Phifer v. City of New York*, 289 F.3d 49, 61 (2d Cir. 2002).

Defendants argue that based on the 'totality of the circumstances' that Woo encountered in the Southerland investigation and home, Woo made a reasonable determination that there existed emergency circumstances necessitating a warrantless seizure of the children. Defendants, however, are unable to explain why the particular circumstances that Woo encountered in the Southerland home established that there was imminent danger to the children's life or limb requiring removal in the absence of a court order. Viewing the facts in the light most favorable to plaintiffs, a reasonable juror could

Substantive Due Process Claim

Plaintiff Southerland alleges that Woo deprived him of his substantive due process rights under the Fourteenth Amendment by lacking a reasonable basis for removing the children from his home without a court order.[30]

Substantive due process "protects against government action that is arbitrary, conscience shocking, or oppressive in a constitutional sense, but not against a government action that is incorrect or ill-advised." *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995). A parent's substantive right for his family to remain together without state interference, *see Tenenbaum*, 193 F.3d at 600, ". . . is counterbalanced by the compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves." *Wilkinson*, 182 F.3d at 104 (internal quotations and citation omitted). As discussed earlier, parents' substantive due process rights are not violated when there is a removal for the purpose

---

determine that the circumstances Woo encountered did not demonstrate an imminent danger to the children's life or limb. Accordingly, summary judgment is not appropriate on plaintiff children's Fourth Amendment claim of unlawful seizure.

[30] Plaintiff Southerland alleges that because Woo's observations were the result of an illegal search and seizure, this Court should not consider Woo's observations of the home in analyzing the decision to remove the children. Plaintiff relies upon the "fruit of the poisonous tree" doctrine as the basis for his argument. See Pl. Opp. Motion ¶¶ 23-25, 35. However, given my conclusion that the search of Southerland's home was not unlawful, it is appropriate to consider Woo's observations for purposes of analyzing Southerland's substantive due process claim.

of keeping children safe during an investigation and court confirmation of the basis for the removal. *See Nicholson,* 344 F.3d at 174.

Plaintiff Southerland's children were removed from the home and held in ACS custody pending a timely post-deprivation hearing where a family court judge confirmed the removal. Thus, no reasonable juror could find that the removal of the children from their home in order to verify that they had not been neglected or abused was so "shocking, arbitrary, and egregious," *Tenenbaum,* 193 F.3d at 600, that Southerland's substantive due process rights were violated. Accordingly, defendant's motion for summary judgment is appropriate on plaintiff Southerland's substantive due process claim.[31]

---

[31] In the absence of a qualified immunity defense, summary judgment would not be appropriate on the procedural due process claims of both sets of plaintiffs. Plaintiffs claim that Woo violated their procedural due process rights under the Fourteenth Amendment by removing the children from Southerland's home without a court order, in the absence of immediate threat of harm to the children's life or health.

Parents generally cannot be deprived of their interest in the custody of their children and children cannot be dislocated from their parents without due process, which generally requires a pre-deprivation hearing. *See Robison v. Via*, 821 F.2d 913, 921 (2d Cir. 1987); *Kia P.,* 235 F.3d 759. However, there is no due process violation when a child is taken from a parent's custody without parental consent or a court order in emergency circumstances. *See Tenenbaum,* 193 F.3d at 593-4. "Emergency circumstances mean circumstances in which the child is immediately threatened with harm ... or where the child is left bereft of care and supervision . . ., or where there is evidence of serious ongoing abuse and the officials have reason to fear imminent recurrence." *Hurlman v. Rice*, 927 F.2d 74, 80 (2d Cir. 1991)(internal quotations and citations omitted); *see also Robison*, 821 F.2d at 922. "If the danger to the child is not so imminent that there is reasonably sufficient time to seek prior judicial authorization, *ex parte* or otherwise, for the child's removal, then the circumstances are not emergent." *Nicholson*, 344 F.3d at 171 (citing *Tenenbaum,* 193 F.3d at 594).

Although defendants argue that the 'totality of the circumstances' Woo encountered in the Southerland home required an ex parte removal, they fail to explain why there was not sufficient time for Woo to seek a court order

## Claims against Defendant City

Plaintiffs allege that the City is liable under 42 U.S.C. § 1983 because the removal of the children without a reasonable basis was pursuant to the City's official policy and because the City failed to train police officers accompanying ACS employees on home visits and investigations.

## Plaintiff Children's Claim

Plaintiff children allege that the City is liable under 42 U.S.C. § 1983[32] for failing to train or supervise ACS case workers when they investigate cases of suspected abuse or neglect.[33] Plaintiff Children's Opposition Memorandum, p. 22.[34] In order to

removing the children. Viewing the facts in the light most favorable to plaintiffs, a reasonable juror could find that there was sufficient time to acquire a court order prior to the removal.

Accordingly, summary judgment is not appropriate on both sets of plaintiffs' procedural due process claims.

[32] 42 U.S.C. § 1983 provides that

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

[33] This is the only claim against the City argued by the plaintiff children. Since plaintiff Southerland does not argue a failure to train claim in his papers, I do not consider that claim with respect to plaintiff Southerland.

[34] Defendants are correct that plaintiff children have raised this claim "[f]or the first time in their Memorandum of Law," Defendant's Reply Memorandum, p. 13. In plaintiffs' Amended Complaint, the failure to train

hold a municipality liable as a "person" under 42 U.S.C. § 1983,

plaintiff must establish that a government policy or custom

caused the deprivation of his constitutional rights.[35] *Monell v.*

*Dep't of Social Services*, 436 U.S. 658, 690-91, 694 (1978); *cf.*

*Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ("[T]o

hold a city liable under § 1983, a plaintiff must plead and prove

three elements: (1) an official custom or policy that (2) causes

---

claim relates to police officers accompanying ACS employees, not the failure
to train ACS case workers.  Specifically, plaintiffs allege in the Amended
Complaint that

> the City's Police Department took no action to train, educate, or
> otherwise instruct its police officers who accompanied ACS employees on
> home visits and investigations, including the execution of Family Court
> orders authorizing entry on premises as to the constitutionally
> permitted circumstances under which children could be removed from their
> children without a court order or to prevent ACS employees from removing
> children from their homes without a court order in the event there were
> insufficient grounds for doing so.

Amended Complaint ¶ 57.  Because the failure to train claim alleged in
plaintiff children's opposition memorandum was not alleged in the Amended
Complaint, the claim could be dismissed.  *See Penney v. AIG Domestic Claims,
Inc.*, 2007 WL 541711, at *9 (S.D.N.Y. 2007) (considering plaintiff employee's
pleaded claim of constructive charge rather than claim based on theory that
plaintiff was actually terminated because the actual termination theory was
only raised in plaintiff's papers in opposition to summary judgment); *see also
Southwick Clothing LLC v. GFT (USA) Corp.*, 2004 WL 2914093 at *6-7 (S.D.N.Y.
2004) ("A complaint cannot be amended merely by raising new facts and theories
in plaintiffs' opposition papers, and hence new allegations and claims should
not be considered.").

However, under Federal Rule of Civil Procedure 15(b), "a district court
may consider claims outside those raised in the pleadings so long as doing so
does not cause prejudice."  *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 569 (2d
Cir. 2000).  In order for a district court to decline to consider a newly
raised issue, "a party's failure to plead an issue it later presented must
have disadvantaged its opponent in presenting its case."  *New York State Elec.
& Gas Corp. v. Secretary of Labor*, 88 F.3d 98, 104 (2d Cir. 1996), *cited in
Cruz*, 202 F.3d at 569.  Because I do not find that defendants are
disadvantaged by plaintiff children's claim based on the City's alleged
failure to train ACS employees, I consider the claim.

[35] The Supreme Court has held that "a municipality cannot be held liable
*solely* because it employs a tortfeasor – or, in other words, a municipality
cannot be held liable under § 1983 on a *respondeat superior* theory."  *Monell*,
436 U.S. at 691.

the plaintiff to be subjected to (3) a denial of a constitutional right."). The Supreme Court has held "that the inadequacy of [] training may serve as the basis for § 1983 liability . . . where the failure to train amounts to deliberate indifference to the rights of persons with whom the [government employees] come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989) (discussing failure to train police officers).

In order to find Section 1983 liability based on the City's failure to train, the plaintiff must "demonstrate both the requisite culpability as well as causation." *Morrissey v. City of New York*, 963 F.Supp. 270, 273 (S.D.N.Y. 1997) (citing *Board of the County Commissioners of Bryan County v. Brown*, 520 U.S. 397 (1997)). With respect to culpability, "failure to train or supervise must amount to . . . a 'deliberate indifference' to the rights of citizens before liability can be imposed." *Id* (citing *City of Canton, Ohio v. Harris,* 489 U.S. 378, 388-89 (1989)). A showing of deliberate indifference requires that "city policymakers made a deliberate choice from among various alternatives not to fully train employees." *Id* (internal citations and quotations omitted).

> Such a deliberate choice could be shown where 'in light of the duties assigned to specific officers . . . the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need.'

*Id* (quoting *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)).

"Moreover, 'deliberate indifference' constitutes more than merely 'simple or heightened negligence' . . . . [I]t involves a 'conscious disregard' on the part of municipal employees for the consequences of their actions." *Morrissey v. City of New York*, 963 F.Supp. 270, 273 (S.D.N.Y. 1997) (quoting *Brown*, 520 U.S. at 407). To determine whether a municipality's failure to train or supervise constitutes deliberate indifference, the Second Circuit applies a three-prong test:

> (1) the plaintiff must show that a policymaker knows 'to a moral certainty' that her employees will confront a given situation;
>
> (2) the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation; and
>
> (3) the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of the citizen's constitutional rights.

*Walker v. City of New York*, 974 F.2d 293, 297 (2d Cir. 1992).

In this case, defendants concede that "investigations of child abuse and neglect pose difficult challenges, and implicate the constitutional rights of the families being investigated," Defendant's Reply Memorandum, p. 13, but plaintiffs cannot demonstrate that the City's training policies with respect to ACS case workers amount to deliberate indifference on the part of the

-35-

City. Madeline Duran, Borough Director for Field Operations,
Division of Child Protection, testified that case worker trainees
have "more one-on-one contact" with their supervisors than
regular case workers; that trainees are assigned to a training
unit for three to four months, during which time they are given
cases of increasing complexity; that trainees reported to the
most experienced supervisors; that when a trainee went on a field
visit at night, the supervisor would remain in the office to
handle emergency calls; that a supervisor would accompany a
trainee into the field "[i]f, for whatever reason, the case
worker requested it because they were having difficulty with
making an assessment . . . ," Duran Dep., p. 10; and that a
supervisor would decide when the trainee was ready to be
transferred to a regular unit. Duran Dep., pp. 10-14.
Christopher Guardo, Director of the Legal Training Unit of the
Family Court Legal Services Division of ACS, testified that ACS
trains case workers in a "child protective academy," Guardo Dep.,
p. 9, and that his unit trains case workers "specifically with
respect to removal of children from homes without a court order."
*Id.* p. 8. Among other things, his unit explains to case workers
concepts such as procedural due process rights, substantive due
process rights, and "the concept of imminent danger."[36]   *Id.* p.

---

[36] With respect to "imminent danger," under the Fourth Amendment, "[t]he
warrantless seizure of a child by government officials pursuant to a child
abuse or neglect proceeding is reasonable if it is justified by exigent
circumstances." *Hollenbeck v. Boivert*, 330 F.Supp.2d 324, 334 (S.D.N.Y.

12.  Under these circumstances, no reasonable juror could infer
that the City's training of ACS case workers was "so likely to
result in the violation of constitutional rights, that the
policymakers . . . can reasonably be said to have been
deliberately indifferent to the need" for more training.  *City of
Canton v. Harris*, 489 U.S. 378, 389 (1989).  Accordingly, summary
judgment is granted in favor of the City on plaintiff children's
claim.

Plaintiff Sonny Southerland's Claims[37]

    The remaining Section 1983 claims against defendant City
concern the City's alleged violation of plaintiff Southerland's

---

2004)(internal citations and quotations omitted).  Similarly, under the
standard for assessing procedural due process claims, "government officials
may remove a child from his or her parents' custody before a hearing is held
where there is an objectively reasonable basis for believing that a threat to
the child's health or safety is imminent."  *Gottlieb v. County of Orange*, 84
F.3d 511, 520 (2d. Cir. 1996)(citing cases).
    Guardo also testified that given the current law concerning the removal
of children, it was difficult to discern how the concept of imminent harm
would apply in specific contexts.  When asked how he defined the concept of
imminent danger, Guardo responded,

    I tell them that the definition of imminent danger is not easy and
    quick, that it's a case by case determination.  That if you looked at
    the case law and you looked at what judges in Family Court find to be
    imminent danger and try to assimilate that, it's very confusing and
    sometimes might be even inconsistent.

    So it's hard to give an actual definition than to say if you believe the
    child is in imminent danger to life or health, this and this can or
    should happen.

    In other words, I think you are left with the statute and your judgment
    very often.

Guardo Dep., pp. 15-16.

    [37] "[W]e read the pleadings of a *pro se* plaintiff liberally and
interpret them 'to raise the strongest arguments that they suggest.'"
*McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999)(quoting *Burgos v.
Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

procedural and substantive due process rights under the
Fourteenth Amendment.[38]  Plaintiff Southerland alleges that "ACS
has a policy of 'when in doubt, yank them out.'"  Plaintiff
Southerland's Statement of Facts in Opposition, p. 2.[39]
Plaintiff Southerland also appears to allege that defendant
City's policies concerning the removal of children are racially
motivated.  *See* Article, "Crisis in Family Court: City Gets Tough
on Child Abuse and Neglect, and the Judicial System Staggers
under the Load," dated April 1999, Exhibit to Sonny Southerland
*Pro Se* Submission Papers, p. 53 (noting that "black and Hispanic
children are disproportionately affected by these foster-care
practices") (quoted text underlined, presumably by plaintiff);

_____

[38] Since the plaintiff children do not argue for these claims in their
papers and since plaintiff Southerland appears to argue for these claims in
his papers, I consider these claims in connection with plaintiff Southerland
only.  As stated above, plaintiff alleges

> (5) that the City is liable under 42 U.S.C. § 1983 "[s]ince the  the
> removal of the minor children from plaintiff's home without a court
> order in the absence of any immediate threat of harm to their life or
> health was pursuant to the official policy of the City's Administration
> for Children's Services . . . .";

and that

> (8) that the City is liable under 42 U.S.C. § 1983 since removal of the
> children allegedly without a reasonable basis was pursuant to the City's
> official policy;

Amended Complaint ¶¶ 48-53.

[39] *See, e.g.,* Affidavit of Irwin Eisenstein, Exhibit to Sonny
Southerland *Pro Se* Submission Papers, p. 90 ("The general policy by the City
department, during the time of the removal, was 'when in doubt, yank them
out.'"); *see also* Article, "Cuts Cost: A Historical and Trend Analysis of the
Effects of the Proposed Preventive Service Budget Cuts on the Increase in
Foster Care Placements," Exhibit to Sonny Southerland *Pro Se* Submission
Papers, p. 97 (stating that "[ACS] adopted a 'when in doubt, pull them out'
approach to child protective services") (quoted text underlined).

*see also Southerland v. Giuliani, et al.*, 4 Fed.Appx. 33, 35 n. 1 (noting that "plaintiff alleges that 'defendants have adopted and are presently pursuing (racially motivated) policies, practices, customs and procedures pursuant to which children are removed from their parents' custody and placed in foster care in cases where there is no threat of 'imminent danger'. . . .""). Beyond these conclusory and speculative allegations, plaintiff Southerland has not come forward with specific facts establishing that the City had an official policy or set of practices that caused plaintiff to be subjected to a deprivation of his constitutional rights.[40] Such allegations, without more, do not meet the requisite pleading requirements for Section 1983 actions. *Alfaro Motors, Inc. v. Ward*, 814 F.2d 883, 887 (2d Cir. 1987) (stating that "it is well settled that to state a civil rights claim under Section 1983, a complaint must contain specific allegations of fact which indicate a deprivation of constitutional rights; allegations which are nothing more than broad, simple, and conclusory statements are insufficient to state a claim under Section 1983"). Accordingly, summary judgment is granted in favor of the City on plaintiff Southerland's Fourteenth Amendment claims.

---

[40] Southerland states throughout his opposition papers that he has been denied discovery. The procedural history of this case shows that Magistrate Judge Bloom declared discovery closed after Southerland refused to sign a Protective Order in exchange for defendants producing ACS records for plaintiff. *See* Magistrate Judge Orders dated Aug. 19, 2005; Sept. 23, 2005; and Nov. 22, 2005.

Claim Regarding the Failure to Train Police Officers

Plaintiffs' amended complaint raises the claim that the City allegedly violated their constitutional rights because high-ranking policy-makers within the City's Police Department knew or should have known that failure to train police officers accompanying ACS employees on home visits and investigations would result in the deprivation of constitutional rights of New York City residents. I do not address this claim for several reasons: (1) The plaintiffs do not argue this claim in their motion papers; (2) As Defendant notes, the New York City Police Department was dismissed as a defendant by the Circuit Court. Def. Memo, p. 20; and (3) Insofar as the failure to train claim refers back to ACS policy, plaintiffs' claims fail the *Walker* test as delineated above because they do not allege any facts that demonstrate the existence of an illegal policy.

Therefore, summary judgment is granted in favor of the City on this ground as well.

**CONCLUSION**

For the reasons set forth above, defendants' motion for summary judgment is granted.

The clerk is directed to furnish a copy of the within to the parties and to the magistrate judge.

SO ORDERED.

Dated :    September 27, 2007
           Brooklyn, NY


              By:   /s/ Charles P. Sifton (electronically signed)
                           United States District Judge