UNITED STATES DISTRICT COURT        C/M
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                              :

SONNY B. SOUTHERLAND, SR., *et al.*,       :      **<u>AMENDED</u>**
                                              :      **<u>MEMORANDUM DECISION</u>**
                          Plaintiffs,      :
                                              :      99 Civ. 3329 (BMC)
                  - against -         :
                                              :
TIMOTHY WOO,                           :
                                              :
                          Defendant.      :
------------------------------------------------------------ X

**COGAN**, District Judge.

       This is an action under 42 U.S.C. § 1983 brought by a father and his now-grown children

for damages against Timothy Woo, a former caseworker for the New York City Administration

for Children's Services ("ACS"). Plaintiffs alleged essentially two claims stemming from their

removal from the family home in 1997: (1) Woo made false statements or omitted crucial

information in an affidavit in order to obtain a Family Court order allowing entry into the family

home (the "Entry Order"), thus resulting in a violation of plaintiffs' rights under the Fourth

Amendment; and (2) he then, without court approval, improperly removed the children and

placed them in ACS custody, in violation of their right to be free from an unreasonable seizure

under the Fourth Amendment and their father's right to due process under the Fourteenth

Amendment. After subsequent Family Court hearings, they were placed in foster care, where

they remained until they reached the age of majority.

       Woo defended the case on the following bases: (1) any misstatements or omissions in his

affidavit in support of the Entry Order were unintentional or immaterial; (2) there were

emergency circumstances justifying removal of the children without a court order; (3) even if

there were not emergency circumstances, he is protected by qualified immunity; (4) the plaintiff children are judicially estopped from maintaining this action; and (5) because the Family Court continued their removal after a hearing, there were sufficient grounds as a matter of law for Woo to remove the children, akin to a post-arrest conviction under Cameron v. Fogarty, 806 F.2d 380 (2d Cir. 1989).

This case has been ongoing for approximately 15 years. It has gone to the Second Circuit twice from decisions granting Woo dismissal or summary judgment, and each appeal has resulted in a remand to the district court. See Southerland v. City of New York, 680 F.3d 127 (2d Cir.), rehearing en banc den., 681 F.3d 122 (2d Cir. 2012) ("Southerland I"); Southerland v. Giuliani, 4 F. App'x 33 (2d Cir. 2001). In the more recent Southerland I, the Second Circuit held that summary judgment was inappropriate because there were several disputed facts that were relevant in determining whether defendant was entitled to qualified immunity.

On remand and reassignment to me, an initial trial resulted in a deadlocked jury and, therefore, a mistrial. A second trial resulted in a plaintiffs' verdict of $75,000 for each of the children and $10,000 for the father, the jury finding in their favor on both of their two claims. In addition, pursuant to the Mandate of the Second Circuit in Southerland I, I submitted, and the jury answered, special interrogatories relating to the issue of qualified immunity.

Before me now is Woo's motion for judgment as a matter of law. He first contends that the jury's answers to the interrogatories entitle him to qualified immunity. Alternatively, he reprises his claims of judicial estoppel and reliance on Cameron.

As to qualified immunity, I agree with Woo that any misstatements or omissions in the affidavit in support of the Entry Order were both immaterial and, at worst, negligent; the Family Court would have issued the Entry Order even with the content that plaintiffs say should have

been there.  However, I disagree that there were even arguable emergency circumstances here that warranted immediate seizure of the children, and thus Woo does not have qualified immunity for the seizure.  Based on the jury's answers to the special interrogatories, and the undisputed fact that the children had lived with their father in the apartment for years without any serious adverse impact, there was no reason to believe that immediate harm would ensue had Woo taken the one or two days to apply for a Family Court Order.

At earlier stages of the case, I rejected Woo's claims of judicial estoppel and reliance on Cameron, and I adhere to those rulings for the reasons set forth below.

## BACKGROUND

### I.  Introduction

On May 29, 1997, an Oral Transmittal Report originating from a public school came to the Brooklyn field office of ACS, indicating that on May 12, 1997, a child by the name of Ciara Manning had swallowed a can of paint, and that her father Sonny Southerland, Sr. ("Southerland, Sr.") had not taken her to seek medical attention.  The report described Ciara as "emotionally unstable," and noted that Southerland, Sr. was "unable to control or supervise" her and that he "fails to follow through with mental health referrals."  The report indicated that Ciara Manning and her father were living at 10 Amboy Street in Brooklyn, New York, but that Ciara "may be staying out of the home in an improper environment."

Woo was assigned to the Ciara Manning case.  During the course of his investigation, Woo, unable to access Southerland, Sr.'s apartment to conduct a home visit, applied for an order of entry from the Kings County Family Court.  However, Woo made some misstatements and omitted some information in his application, including not advising the court that Ciara was

known to be a runaway, and identifying Ciara's half siblings from her mother, rather than Southerland, Sr.'s children, as the children residing in his home. The Family Court granted Woo's request for the Entry Order.

On June 9, 1997, when Woo executed the Entry Order and visited the Southerland home, he removed Sonny Southerland Jr., Venus Southerland, Nathaniel Southerland, Emmanuel Felix, Kiam Felix, and Elizabeth Felix ("the plaintiff children" or "the Southerland children")[1] from the apartment without a court order. Shortly thereafter, the matter came on for hearing before the Family Court, which confirmed and extended the removal. In 1999, plaintiffs filed a complaint against Woo, alleging that he had violated their constitutional rights in seeking an order of entry and removing the plaintiff children.

## II. The Trial

### A. *Plaintiffs' Case*

The plaintiff children first called Madeline Duran, who was the Deputy Director of the Brooklyn field office of ACS in 1997. She testified as to ACS policy and practice, including actions taken during an ACS investigation. When a complaint comes to ACS, Duran testified that "ACS [is] required to assess the primary caretaker's home" in order "to gather information from anyone that has anything to do with the children to assess the allegations and their home living arrangement, their behavioral issues." The home assessment would help the caseworker to evaluate the safety and well-being of all the children living in the home, and not just the child named on the report. Even if the parent told the caseworker that the subject child was not in their home, Duran stated that a home assessment was still necessary.

_____
[1] Emmanuel Felix passed away after the complaint in this case was filed.

4

Duran noted that it is "very rare" for ACS to remove children without a court order, and that this procedure is considered "a measure of last resort" – meaning "that the children would be removed only when all efforts to remediate problems leading to removal have failed and removal is the only way to ensure the welfare of the children." Duran stated that in order to remove children without a court order, there had to be an "imminent or immediate risk" "to the safety of th[e] children." She noted that there were other options that a caseworker should take before resorting to removal of a child. For example, if there was insufficient food in the house, Duran stated that the caseworker would be expected to take money out-of-pocket to provide for food for the day or go back to the field office to procure funds for the following day until something could be done to address the lack of food at the home. If the caseworker found a lamp on the floor without a shade, she expected the caseworker to "[e]ngage in a conversation with the parent to move, remove, the lamp and put it in a safe place." Duran stated that generally speaking, if a caseworker had concerns about a parent's home, she would expect the caseworker "to engage the parent in conversation as to how they can provide a way to make it safe." She also noted that a Family Court order authorizing removal could usually be obtained the same day or the next day if the circumstances warranted it.

The plaintiff children then called Southerland, Sr., who testified as to the events preceding the removal, as well as the removal and its aftermath. According to Southerland, Sr., Ciara Manning ran away from home and "was at various addresses" during the time of ACS's investigation of the paint drinking incident. Southerland, Sr. had first become aware of Ciara's drinking paint after he received a phone call from her school. He testified that he "went up to the school immediately" and met with several people, including Ciara's teacher, guidance counselor and principal. They informed Southerland, Sr. that Ciara had "told them that she intends to kill

herself if she was allowed to go home." The school told Southerland, Sr. that "they wanted to ensure that [Ciara] would receive ongoing mental health services." Southerland, Sr. testified that he told the school that he could not take any steps on behalf of Ciara because "she wasn't under [his] control."

Southerland, Sr. testified that he was aware of the report sent to ACS, and that he never refused to allow Woo to do an inspection of his apartment. When he met Woo in the hallway of his apartment building while he was taking his children to school, he told Woo that he did not have the time to meet with Woo right then, but asked Woo to set up an appointment, which Woo never did. Southerland, Sr. also testified that Woo never offered any services to his family.

As to the events of June 9, 1997, Southerland, Sr. testified that when he looked at Woo's warrant, he told the police officers: "This is no good, I don't know who these children are. I'm not the father of these children. They don't live here." Eventually the police officers were able to convince Southerland, Sr. to let Woo and his co-workers in. According to Southerland, Sr., Woo took "less than 45 seconds" to go through the apartment. Woo never offered any services to Southerland, Sr. prior to removing the plaintiff children, nor did Woo point out things in the apartment that Southerland, Sr. could correct instead of removing the children.

Southerland, Sr. testified that his children were given regular meals. The girls slept on a cot, and the boys slept on mats on the floor. There was usually a shade on the lamp in the boys' bedroom, but at the time of Woo's inspection, there was no shade. Southerland, Sr. also testified that there were extension cords throughout the apartment for the lights and the television, but that they were insulated. As for the equipment stored in one of the bedrooms, Southerland, Sr. stated that the equipment was "stable" and that the plaintiff children obeyed his rule to never go into that room.

The plaintiff children also called Sergeant Christopher Aitola, one of the police officers who was called to the Southerland home on June 9, 1997. He testified that Southerland, Sr.'s apartment was "just an average apartment for that [housing development]"; that there was nothing about the children that was unusual or noteworthy; and that he did not "reach the conclusion that the children were in any danger in that apartment."

After Sergeant Aitola, plaintiffs called Fritz Balan. Balan was a Level II Supervisor at ACS during the relevant time period, and was tasked with reviewing the Ciara Manning complaint as soon as it came to ACS. In addition to the complaint, Balan testified that he reviewed prior records ACS had on the Manning-Southerland family but that some of the records were not available to him at the time. Balan then met with his team of five caseworkers, including Woo, to discuss the Ciara Manning case. Balan then sat down with Woo only and "gave him directive [sic] actually to visit the home and assess for family functioning, attempt to learn of the demographics as to currently exists [sic] in the household and also find out who are the parents providing care for the children and which children are actually in the care of the parent."

Balan testified that because it was ACS's policy to "actually visit the home that [it] receive[s] the report with the address on it," Balan expected Woo to visit the Southerland residence at 10 Amboy Street. Balan stated that he expected Woo "to make sufficient contact [with the parent(s) and their children]" within 48 hours of receiving the complaint. If contact was not made within 72 hours, then, according to Balan, the caseworker would need to seek court intervention. Balan testified that this was the case even if the caseworker knew that the subject child was not living at home, because the caseworker would still have to visit the parent's

home to make sure that any other children there were safe.  As Balan noted, ACS is "accountable for every children or every person that are under the age of 18 in [a] household."

Balan testified that the decision to seek an order of entry was a "joint decision."  Balan stated that, after Woo obtained entry, Woo had called him on the night of the removal and told him about the conditions that he had observed in the Southerland home.  After hearing Woo's description, Balan testified that he "believe[d] there was enough safety concern to warrant immediate intervention for . . . all the children," and directed Woo to immediately remove them.

After Balan, each of the plaintiff children testified.  They discussed their lives in the Southerland home prior to their removal, the removal, and its impact on their lives.  Southerland, Sr. then called himself as a witness.

B.  *Defendant's Case*

Woo called himself as his first witness. According to Woo, Southerland, Sr. was uncooperative in his investigation of the paint drinking incident.  Woo stated that Southerland, Sr. refused to allow Woo access to his children or state where Ciara was.  He discussed his numerous failed attempts to visit the Southerland home prior to seeking the Entry Order.  Woo testified that on June 4, 1997, he met Southerland, Sr. and five children in the hallway of their apartment while they were on their way to school.  Although Woo was unable to talk to the children, Southerland, Sr. did give him the names of his children.

Woo also testified about a telephone conversation he had with Joan Ewing, the guidance counsel at Ciara Manning's high school, on June 3rd.  According to Woo's notes on their telephone conversation, Woo learned that Ciara Manning had swallowed one cup of water paint, that she had "suicidal ideations," and made a comment, "I will kill myself."  Ciara had made this

comment in connection with the suggestion that she would be sent back to her father. Woo also learned that the school was having "problems trying to get father's attention." In particular, Ciara's school was concerned that he had "not been following through with the recommendations for physical health assessment, to see a medical doctor, in other words, to assess her physical health" and that "they had concerns for Ciara's safety and well-being." Additionally, the school did not know where Ciara Manning was living at the time.

Woo testified that Balan instructed him to prepare to file a case referral to ACS's legal department. According to Woo, after he met with ACS's legal department, an attorney advised him to seek an order to enter the Southerland home. In his affidavit to Family Court, Woo stated that "on May 12, 1997, Sierra [sic] Manning, age 16 tried to kill herself by swallowing non-toxic paint. Mr. Sutherland [sic] did not take Sierra to a medical doctor and refused to take Sierra for psychiatric evaluation." Woo also stated that "Mr. Sutherland [sic] has refused to allow the Administration for Children's Services into his home to speak to [his] children."

As to why the names of Miracle Manning, Michael Manning, Eric Anderson, Richy Anderson, Felicia Anderson, and Erica Anderson (the "Manning children"), and not the plaintiff children, were on Woo's affidavit, Woo testified that he had gotten the names of the Manning children from a printout that was included in ACS's file on Ciara Manning. He stated that their inclusion on his affidavit instead of the plaintiff children was unintentional.

Woo testified that after the plaintiff children's removal on June 9, 1997, he petitioned Family Court four days later for an order finding the plaintiff children to be abused and neglected. On the same day, a hearing on Woo's petition took place in front of Judge Daniel Turbow. According to Woo, this is when Judge Turbow remanded the plaintiff children to the custody of the Commissioner of ACS, and continued their placement in foster care.

C.  *Plaintiffs' Rebuttal Case*

Finally, the plaintiff children read in excerpts from the depositions of Lisa Clark and Crystal Gaskin Daise, the two other ACS caseworkers who accompanied Woo to the Southerland home on June 9, 1997.  Clark testified about the night of the removal.  She could not remember whether anyone in the apartment needed medical attention, and she testified that she did not talk to Southerland, Sr. inside the apartment.  She stated that Balan and Woo were involved in the decision to remove the children, and that she had no part in this decision.

Daise also testified about the night of the removal.  She stated that she did not recall speaking to anyone in the Southerland apartment, and that she did not remember "anything unusual about the appearance of the children."

## III.  The Special Interrogatories

The jury found that Woo had violated plaintiffs' Fourth Amendment right to be free from unreasonable searches and Fourteenth Amendment right to due process of law, as well as the plaintiff children's Fourth Amendment right to be free from unreasonable seizures.  The jury awarded each of the plaintiff children $75,000 and Southerland, Sr. $10,000 in compensatory damages.

After the jury found in favor of plaintiffs, the Court submitted special interrogatories to it. The jury made a number of factual findings in the Special Interrogatories to resolve the factual disputes cited by the Second Circuit in its decision to remand this case to the district court.  The jury found that Woo had learned, at some point prior to applying for an order of entry, that Ciara Manning had stated or expressed that she wanted to kill herself and that her legal address was 10 Amboy Street, Apartment 14J in Brooklyn, New York – Southerland, Sr.'s address.  The jury

also found that prior to applying for an order of entry, Woo had learned that Ciara Manning was not residing at the 10 Amboy Street residence. Additionally, the jury found that prior to the plaintiff children's removal from their home on June 9, 1997, Southerland, Sr. was uncooperative in Woo's investigation.

As to the conditions of the Southerland apartment on June 9, 1997, the jury found that Woo had observed the following prior to the removal of the children: extension cords extending through the apartment; electrical equipment that was stacked in a haphazard manner in one of the bedrooms, which was unlocked; a lamp without a shade sitting on the floor of the boys' bedroom, which was in very close proximity to the mat and/or blankets and sheets on the floor that the boys slept on; no furniture in the boys' bedroom on which the lamp could have been placed; beds in the boys' bedroom; and a refrigerator that lacked an adequate amount of food for a family of six children (there was testimony that Woo had not checked the kitchen cabinets for food). Additionally, although the jury found that one of the other ACS caseworkers observed Venus Southerland limping due to an injury to her foot, it found that Venus never informed Woo or one of the other ACS caseworkers that she had a puncture wound on her foot. The jury found that Woo had not observed the children wearing dirty clothing. The jury also found that neither Woo nor the other ACS caseworkers offered Southerland, Sr. help in the form of services.

Finally, the jury found that Woo did not accurately describe the conditions of the Southerland home to Balan on the telephone, but that Balan had approved the removal of the children from the home. The jury also found that the two other ACS caseworkers who were present on the night of the removal did not oppose the decision to remove the plaintiff children.

**DISCUSSION**

## I. Qualified Immunity

A. *Overview*

"Qualified immunity shields government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Zellner v. Summerlin, 494 F.3d 344, 367 (2d Cir. 2007) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982)). The relevant question is whether it was clear to the defendant "that his conduct was unlawful in the situation he confronted." Stephenson v. Doe, 332 F.3d 68, 77 (2d Cir. 2003) (quotation marks and citation omitted). Qualified immunity applies if a government officer's "action was 'objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken.'" Taravella v. Town of Wolcott, 599 F.3d 129, 133 (2d Cir. 2010) (quoting X-Men Sec., Inc. v. Pataki, 196 F.3d 56, 66 (2d Cir. 1999)). "In other words, if 'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context," a defendant is entitled to qualified immunity. Walczyk v. Rio, 496 F.3d 139, 154 (2d Cir. 2007) (quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S Ct. 1092, 1096 (1986)); see also Southerland I, 680 F.3d at 141; V.S. v. Muhammad, 595 F.3d 426, 431 (2d Cir. 2010).

Application of qualified immunity is a mixed question of fact and law. See Kerman v. City of New York, 374 F.3d 93, 109 (2d Cir. 2004). The jury must decide any factual questions in dispute, as it has done here through the special interrogatories, and "the court then may make the ultimate legal determination of whether qualified immunity attaches *on those facts*." Id.

(internal quotation marks and citation omitted) (emphasis in original); see also Zellner, 494 F.3d at 368.

B. *Entry Order*

The Second Circuit, in its 2011 decision, recognized that plaintiffs could have a viable claim under the Fourth Amendment for Woo's entry into their home. See Southerland I, 680 F.3d at 143. However, in reversing the district court's decision to grant summary judgment for Woo on this claim, the Second Circuit pointed out that there were several disputed facts – namely, whether Woo was aware that Ciara Manning was not residing in Southerland, Sr.'s apartment and whether he knew the names of the plaintiff children at the time he applied for an order of entry – that were relevant in determining whether Woo "knowingly or recklessly made false statements in his application for the Order Authorizing Entry." Id. at 148. The Second Circuit also concluded that there were genuine issues of material fact as to whether Woo's false statements in his affidavit in support of the Entry Order were necessary to the Court's finding of probable cause, thereby making summary judgment inappropriate. Id. at 148-49.

Normally, a government officer "who relies in good faith on a warrant issued by a natural and detached magistrate upon a finding of probable cause is presumptively shielded by qualified immunity from personal liability for damages." Simms v. Vill. of Albion, 115 F.3d 1098, 1106 (2d Cir. 1997) (citing Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991)). However, it is well-settled that where the government officer "'knowingly and intentionally, or with reckless disregard for the truth, ma[kes] a false statement or omit[s] material information, and that such false or omitted information was necessary to the finding of probable cause,'" qualified immunity will not shield the officer from liability. See Martinez v. City of

Schenectady, 115 F.3d 111, 115 (2d Cir. 1997) (quoting Soares v. Connecticut, 8 F.3d 917, 920 (2d Cir. 1993)); see also Southerland I, 680 F.3d at 143.

To determine whether a government officer who has made false statements to a magistrate is nonetheless entitled to qualified immunity, courts apply the "corrected affidavit" doctrine. See Southerland I, 680 F.3d at 143; Martinez, 115 F.3d at 115. Under the "corrected affidavit" doctrine, "'a court should put aside allegedly false material, [and] supply any omitted information." Martinez, 115 F.3d at 115 (quoting Soares, 8 F.3d at 920). If the "corrected affidavit" would support a finding of probable cause, then granting the government officer qualified immunity is appropriate. Id. To determine whether probable cause exists to support the issuance of an order, a district court should examine the "totality of the circumstances." McColley v. Cnty. of Rensselaer, 740 F.3d 817, 823 (2d Cir. 2014).

Here, Woo told the Family Court that Ciara Manning had tried to kill herself; that Southerland, Sr. did not take her to a medical doctor and refused to take Ciara for a psychiatric evaluation; and that Southerland, Sr. had refused to let ACS enter his home and speak to the children named on the affidavit. Importantly, the jury agreed with these statements; it found that Woo had learned "that Ciara Manning had stated or expressed that she wanted to kill herself," and that Southerland, Sr. was uncooperative in Woo's investigation prior to the plaintiff children's removal. Additionally, the jury found that Ciara Manning's legal address was 10 Amboy Street, the address Woo supplied on his application for an order of entry.

Plaintiffs allege two deficiencies in Woo's affidavit. First, Woo never told the Family Court that he knew Ciara Manning was not residing at 10 Amboy Street, and that she was a runaway child. The plaintiff children argue that this information was relevant to the Family Court's determination of probable cause, as outlined by section 1034(2) of the New York State

Family Court Act.[2]  See Southerland I, 680 F.3d at 144.  However, examination of the testimony

of the plaintiff children's witnesses, Duran and Balan, supports the conclusion that even if the

Family Court had been made aware of the fact that Ciara Manning was not residing at 10 Amboy

Street, it still would have issued the Entry Order.  Duran stated that ACS had an obligation to

investigate the parent's home, even if the parent had told the caseworker that their child was a

runaway.  Additionally, ACS was required to assess the safety of every child in the home, even if

the caseworker had no particularized concern for the other children in the home.  And where a

parent refused to cooperate with ACS, Duran noted that "you force the [case]worker to take

alternative action to safeguard the children."

Balan stated that it was ACS policy to ensure the safety of the children in the household

by completing a home visit within 72 hours from receiving the initial complaint, and if the

caseworker was unable to conduct a home visit within that time frame, he would have to meet

with ACS's legal team to discuss the possibility of getting an order of entry.  As Balan stated,

"we are responsible for all children that reside[] inside the home of Mr. Southerland," so even if

Ciara Manning was not residing at 10 Amboy Street, Woo still needed an order of entry to

examine the other children in the Southerland home.

The order for entry into the Southerland home was also necessary because of Ciara

Manning's threat to kill herself if forced to go back home – a threat both Woo and Southerland,

Sr. acknowledged she had made to school administrators.  Although Woo stated that he had no

"particularized suspicions" that the other children in the Southerland home were being abused,

---

[2] At the time of defendant's application, Section 1034(2) provided that "[w]here there is probable cause to believe that an abused or neglected child may be found on premises, an order under this section may authorize a person conducting the child protective investigation, accompanied by a police officer, to enter the premises to determine whether such a child is present."  N.Y. Fam. Ct. Act § 1034(2) (McKinney 1997).

the fact that the subject child, even if she was not residing at her father's home, made such an extreme threat would raise concerns about the well-being of the other children at the home.

The second problem that plaintiffs allege in Woo's affidavit is that he listed the names of the Manning children, rather than those of the plaintiff children, as the children who were residing at 10 Amboy Street. But it cannot be said that this error, even if Woo knew it to be false, made any difference in the Family Court's determination to grant the Entry Order. <u>See Velardi v. Walsh</u>, 40 F.3d 569, 574 (2d Cir. 1994). What was important to the Family Court was the fact that there were children in Southerland, Sr.'s home as to whom he was not allowing Woo access. The names were immaterial. Therefore, because a corrected affidavit to the Family Court – containing information regarding Ciara Manning's status as a runaway and the fact that she was not residing at 10 Amboy Street, as well as the correct names of the Southerland children – would have still been sufficient to support probable cause for issuing the Entry Order, Woo is entitled to qualified immunity on plaintiffs' Fourth Amendment claim. <u>See</u> <u>Escalera v. Lunn</u>, 361 F.3d 737, 743-44 (2d Cir. 2004).

### C. *Removal of the Plaintiff Children*

The Second Circuit recognized that plaintiffs could have two constitutional causes of action for Woo's removal of the plaintiff children. First, both Southerland, Sr. and the plaintiff children could "have a cause of action for violation of the Fourteenth Amendment under a theory of denial of procedural due process." <u>Southerland I</u>, 680 F.3d at 142. Second, the plaintiff children could have a cause of action under the Fourth Amendment for "the seizure of his or her person." <u>Id.</u> at 143.[3]

---

[3] The Second Circuit also noted that Southerland, Sr. could have a cause of action under the Fourteenth Amendment for substantive due process, but that there was no substantive due process violation in this case. <u>See</u> <u>Southerland I</u>, 680 F.3d at 154.

In reversing the district court's decision to grant qualified immunity to Woo on plaintiffs'

Fourteenth Amendment procedural due process claim, the Second Circuit noted that the district

court incorrectly stated that the law concerning procedural due process in the context of a child

removal was undeveloped at the time of the plaintiff children's removal; rather, it "was clearly

established at the time of the Southerland Children's removal that state officials could not

remove a child from the custody of a parent without either consent or a prior court order unless

emergency circumstances existed." Id. at 150 (internal quotation marks omitted). Thus,

"'except where emergency circumstances exist' a parent can 'not be deprived' of the custody of

his or her child 'without due process, generally in the form of a predeprivation hearing.'"

Tenenbaum v. Williams, 193 F.3d 581, 596 (2d Cir. 1999) (quoting Hurlman v. Rice, 927 F.2d

74, 79 (2d Cir. 1991)); see also Southerland I, 680 F.3d at 149. In Tenenbaum, the Second

Circuit defined "emergency circumstances" as "'circumstances in which the child is immediately

threatened with harm.'" Id. at 596 (quoting Hurlman, 927 F.2d at 80). Notably, the Court

recognized that "the mere 'possibility' of danger is not enough." Id. (internal quotation marks

and edits omitted). Although a determination of whether emergency circumstances may be

present is fact-specific, the "types of factual circumstances that constitute imminent danger

justifying emergency removal" include "the peril of sexual abuse," "the risk that children will be

left bereft of care and supervision," and "immediate threats to the safety of the child."

Southerland I, 680 F.3d at 149 (internal quotation marks and citation omitted).

As to the plaintiff children's Fourth Amendment seizure claim, courts have generally

required a government officer to reasonably believe that there was probable cause to "seize" a

person. See, e.g., Anthony v. City of New York, 339 F.3d 129, 137 (2d Cir. 2003); Kerman v.

City of New York, 261 F.3d 229, 237 (2d Cir. 2001); Cerrone v. Brown, 246 F.3d 194, 199 (2d

Cir. 2001).  In the child seizure context, probable cause exists "if the caseworker knew 'facts and circumstances that were sufficient to warrant a person of reasonable caution in the belief that' a child was abused or neglected."  Southerland I, 680 F.3d at 158 (quoting Tenenbaum, 193 F.3d at 602-03).  Additionally, qualified immunity is appropriately applied on a Fourth Amendment unreasonable search and seizure claim where a government officer believes there were exigent circumstances present.  See, e.g., Koch v. Town of Brattleboro, 287 F.3d 162, 169 (2d Cir. 2002); Tierney v. Davidson, 133 F.3d 189, 197 (2d Cir. 1998).  The "exigent circumstances" exception "permits removal of a child where the state officers making the search or seizure 'have reason to believe that life or limb is in immediate jeopardy.'" Tenenbaum, 193 F.3d at 605 (quoting Good v. Dauphin Cnty. Social Servs. For Children and Youth, 891 F.2d 1087, 1094 (3d Cir. 1989)).

In Southerland I, the Second Circuit declined to articulate whether a finding of probable cause or exigent circumstances was necessary to justify the seizure of a child without judicial authorization or parental consent under the Fourth Amendment.  See Southerland I, 680 F.3d at 160.  Instead, the Circuit Court noted that the district court may need to determine the appropriate standard to apply, but that if it "determines that under either standard the Southerland children can establish that the circumstances in the home did not justify the seizure as a matter of law, then it need not decide whether the probable cause or exigent circumstances standard is applicable."  Id. at 161-62.

In the context of child removals, it seems to me that the difference between these two articulations of the Fourth Amendment standard is not significant; in fact, the tests are functionally the same.  If exigent circumstances exist to justify seizure of a child from the home, then probable cause for the seizure is also present.  The converse seems equally true.  The

Second Circuit's decision in <u>Tenenbaum</u> illustrates this: if a caseworker knows facts that would cause a person of reasonable caution to believe that a child was being abused or neglected (<u>i.e.</u>, there is probable cause), then it is also the case that this caseworker has reason to believe that the child is in immediate danger (<u>i.e.</u>, exigent circumstances are present). <u>See</u> <u>Tenenbaum</u>, 193 F.3d at 602-03, 605.

From this, it further follows that there is no practical difference between emergency circumstances – the standard used to evaluate plaintiffs' Fourteenth Amendment claim on the plaintiff children's removal – and probable cause/exigent circumstances – the standard used to evaluate the plaintiff children's Fourth Amendment claim. <u>See</u> <u>Southerland I</u>, 680 F.3d at 161 (holding that "the existence of emergency circumstances sufficient to justify removal of the Southerland children in a manner comporting with their due process rights would also certainly suffice to justify their removal in a manner comporting with their Fourth Amendment rights barring unreasonable seizure"); <u>see also</u> <u>Tenenbaum</u>, 193 F.3d at 605; <u>Schweitzer v. Crofton</u>, 935 F. Supp. 2d 527, 551 (E.D.N.Y. 2013). To not recognize this would be to require a caseworker to make a determination of whether emergency circumstances *and* exigent circumstances are present; if one is present but not the other, then by removing a child, the caseworker risks violating a constitutional right. This would make little sense. If a caseworker knows a child is threatened with immediate harm, he should be able to remove the child without fear that he is violating a constitutional right.

The relevant question, then, for the qualified immunity determination is whether Woo was reasonable in his belief that emergency circumstances were present on the night of June 9, 1997, even though the jury has found, by awarding judgment for plaintiffs, that he was wrong. <u>See</u> <u>Pearson v. Callahan</u>, 555 U.S. 223, 244, 129 S. Ct. 808, 822 (2009); <u>Walczyk</u>, 496 F.3d at

154; see also Garcia v. Does, __ F.3d ___, No. 12-2634, 2014 WL 4099270, at *5 (2d Cir. Aug. 21, 2014).  This is because even if emergency circumstances were not present, qualified immunity is still available to Woo if either it was "objectively reasonable" for him to believe that emergency circumstances were present, or if caseworkers of "reasonable competence" could disagree on whether emergency circumstances were present.  See Escalera, 361 F.3d at 743. This requires looking at all the information that Woo had at the time he decided to remove the plaintiff children.  Id. at 744; see also Zellner, 494 F.3d at 369.

Looking at the facts known to Woo on the night of the plaintiff children's removal, and with the benefit of the jury's answers to the special interrogatories, I conclude that Woo was not reasonable in his belief that emergency circumstances were present, and that no reasonable caseworker would think that such circumstances were present.  The problems that the jury found Woo had observed at the Southerland home – the extension cords, electrical equipment stacked haphazardly in one of the bedrooms, a lamp without a shade near the mats and/or blankets on which the boys were sleeping, and the lack of food in the refrigerator – could not lead a reasonable caseworker to believe that there was an immediate danger to the plaintiff children. These observations do not suggest that the plaintiff children were even close to being in danger of sexual abuse, "bereft of care and supervision," or that there were "immediate threats to [their] safety."   Southerland I, 680 F.3d at 149.  At most, the problems in the Southerland home on the night of June 9, 1997 presented a "possibility of danger," which the Second Circuit in Tenenbaum clearly stated was not enough for removal without a court order. See Tenenbaum, 193 F.3d at 596.

Whether Woo had "arguable emergency circumstances" to remove the children has to be evaluated in the context of other facts in the record, including the undisputed procedures to

which Duran testified. Her testimony was clear that a caseworker has to explore all other options before having to remove the children without a court order, such as engaging in a conversation with the parent or taking money out-of-pocket to purchase food for the day. Woo did none of the things that she testified a caseworker should do prior to removal. To the contrary, Woo did not offer Southerland, Sr. any help in the form of services on that night. Instead, he resorted to what Duran described as the "measure of last resort" – immediate removal of the plaintiff children. Removal without a court order was only appropriate where, as Duran stated, "all efforts to remediate problems leading to removal have failed and removal is the only way to ensure the welfare of the children."

In addition, Duran was clear that a court order of removal, if the Family Court is convinced that emergency circumstances exist, can be obtained the same day as the application or at most the next day. Although the entry in this case occurred late on a Monday night, there was no testimony that Woo would have been unable to obtain an order from the Family Court the next day. Thus, Woo would only have had to wait approximately 12 to 15 hours to obtain a court order. Given the circumstances of the Southerland apartment, Woo either knew or should have known that the plaintiff children would not have been in danger if forced to remain at the apartment for the next 12 to 15 hours. Coupled with the fact that the children had obviously lived in the apartment for all or nearly all of their lives without calamitous consequences, there seems to be no reason why Woo could not have waited to file an application with the Family Court the next day. Based on Duran's testimony, it was more than a mere misjudgment to remove the children without trying to get a court to intervene.

Further, Woo's argument that his removal order was affirmed by Balan is unavailing. The jury found that Woo had not accurately described the conditions of the Southerland home to

Balan.  Balan's decision to order removal of the plaintiff children therefore cannot indicate to us whether caseworkers of reasonable competence would believe that the actual conditions at the Southerland home presented an imminent danger to the children, since Balan made his decision solely based on the incomplete or inaccurate description that Woo gave him.  Nor can Woo rely on the jury's finding that the other two caseworkers did not oppose the decision to remove the children without a court order.  Clark testified that she was not involved in the decision to remove the children, and that the decision was made by Woo and Balan only.  The caseworkers may not have opposed the removal, but they were also trainees and may not have been in a position to oppose it once their supervisor, Balan, had given the order.

The only other testimony that was presented about the conditions of the Southerland apartment on the night of the removal was from Daise and Sergeant Aitola.  Daise stated that she did not "recall anything unusual about the appearance of the children," while Sergeant Aitola stated that the Southerland apartment was "just an average apartment for that [housing development]," and that there was nothing unusual or noteworthy about the children. Importantly, he did not notice any dangers to the children in the Southerland apartment.  Their observations strongly suggest that Woo had no basis to believe that an imminent danger to the plaintiff children was present on the night of their removal.  See Southerland I, 680 F.3d at 151.

In reaching this conclusion, I recognize the path between Scylla and Charybdis that caseworkers sometimes must navigate and which is noted in the caselaw.  See Cornejo v. Bell, 592 F.3d 121 (2d Cir. 2010).  A wrong call not to remove a child can lead to the child's grievous injury; a wrong call to remove a child leads to a separation between parent and child and potential legal liability.  Qualified immunity in the child removal context has to give caseworkers enough leeway to make confident, dispassionate decisions based on the facts as they reasonably

see them, even if they don't see those facts correctly. But based on the jury's verdict, the special interrogatories, and the non-party testimony, I do not think that is what happened here. The risks to these children on the facts established at trial in waiting one day for a court order were exceedingly low. The likelihood of trauma resulting from a nighttime separation from the only parent they had ever known was far higher. There was no good reason to think that they had to be removed immediately without a court deeming it necessary.[4]

## II. Judicial Estoppel

Despite raising the issue on several occasions in this case, Woo has never clearly articulated the basis for his theory that some or all of the plaintiffs are judicially estopped from seeking relief in this case. This may be because, notwithstanding having conducted two trials and extensive discovery in the instant case, there are gaps in understanding what happened in the Family Court. Some of the key portions of what occurred were not transcribed. The transcript of that portion of the Family Court proceedings that was transcribed was lost more than a decade ago, and a replacement that was available in 2002 has been lost as well. At both the first (mistrial) and second trials of this case before me, witnesses testified to their recollection of what had occurred in the earliest part of the Family Court proceedings, and that evidence was in conflict.[5]

Some of the background of what occurred has to be taken from a decision in 2002 on motions for reconsideration and dismissal of the proceedings regarding the extension of the

---

[4] In light of my decision that Woo is not liable for the Entry Order but is liable for seizing the plaintiff children, I have considered whether a new trial as to damages is necessary. I conclude that it is not. No party has suggested that it is, and, more importantly, the damages cannot be reasonably separated. Even if they could, the damages from the seizure eclipse any sustained from the entry.

[5] For example, at the first trial of the instant case, Ciara Manning testified that at the Family Court, she had stated that Southerland, Sr. sexually abused her, but that her statements were false, and made only because her and the plaintiffs children's Guardian had threatened her that she would be imprisoned on outstanding warrants if she did not so state to the Family Court. She did not testify at the second trial.

plaintiff children's removal. The judge who rendered that decision (denying both reconsideration and dismissal of the proceedings) was Family Court Judge Susan Knipps, who obtained a reconstruction of the Family Court transcript because the original was lost (the reconstruction has, since that time, also been lost). She had no involvement in the initial determination to remove the children, but her decision describes some of the earlier proceedings based on her review of the reconstructed transcript.

Aside from Judge Knipps' decision, it seems likely that four days after the removal, Family Court Judge Daniel Turbow ordered the children remanded to the custody of ACS. There is neither a written order nor findings to that effect, but there is a computer printout noting that a proceeding occurred which contains the word "remand." This is the proceeding about which witnesses testified as to their recollection at trial.

Over the course of the next year following the proceeding before Judge Turbow, there was at least one consolidated child abuse proceeding pending (there may have been one for each child, including Ciara Manning), and some hearing or hearings were held, for which we have one petition and an amended petition. We know that on July 1, 1998, Family Court Judge Michael A. Ambrosio entered an order or judgment in or all of those proceedings entitled "Determination upon Fact-Finding Hearing Neglect-Child Abuse." This Order was a template with its few open fields filled in, the most important one stating: "Finding of Sex Abuse against respondent father, P.L. section 130.35(3). Derivative finding as to the other children. Finding of neglect against respondent father based on excessive corporal punishment." It also said "Reasons on the record."

Because the transcripts are lost, Woo did not provide me with the "reasons on the record" referred to above or any portion of the Family Court proceedings other than the computer

printout and Judge Ambrosio's order. Judge Knipps' subsequent order, as noted, refers to some of Judge Ambrosio's findings. In addition, the plaintiff children, in opposing Woo's judicial estoppel argument, gave me the Guardian's brief in the Appellate Division that heard the appeal from Judge Ambrosio's order. That brief purports to quote from the record, including the "reasons on the record" referred to in Judge Ambrosio's order. The reasons, although unambiguous, were perfunctory.

In that excerpt from the brief, Judge Ambrosio finds that Ciara Manning was sexually abused based on her testimony, which he found "completely believable." (She subsequently recanted that testimony in the first trial before me, see fn. 5, supra.) In addition, the excerpt quotes Judge Ambrosio as finding that there was "excessive corporal punishment of your children, they've given those statements to the caseworker." The Guardian's brief, in turn, summarizes (but does not quote) testimony from Woo (citing to the subsequently lost transcript) to the effect that he had spoken to two of the plaintiff children, Southerland, Jr. and Venus, who were nine years old, who told him (Woo) that they had been hit with a Nike belt buckle, chest exercise equipment, and a police stick. It is presumably this testimony from Woo that Judge Ambrosio relied upon in making his finding of excessive corporal punishment. The children themselves, however, according to the Guardian's brief, did not testify.

Approximately three months after Judge Ambrosio's order, another Family Court Judge, Judge Lauria, entered seven orders of "disposition," one as to each of the seven children. We do not have these Orders, and have no record of the proceedings that led to them. They directed each child to remain in ACS custody for 12 months, and further directed Southerland, Sr. to receive various kinds of counseling. One can glean from the papers described above that these

orders were extended, and one can further surmise from both these proceedings and the trials before me that these extensions continued until the children reached majority.

The Appellate Division affirmed Judge Ambrosio and Judge Lauria's orders in In re Ciara M., 273 A.D.2d 312, 708 N.Y.S.2d 717 (2d Dep't 2000). In its decision, the Appellate Division summarily stated:

> The respondent proved by a preponderance of the evidence that the children were neglected and abused by the father . . . . The evidence established that the father abused and neglected the subject children as a result of the sexual abuse which he committed against his daughter Ciara M. and the excessive corporal punishment he inflicted upon all of the children.

Id. at 314, 708 N.Y.S.2d at 719.[6]

It appears that, likely because of the difference in the issues before me and the earlier state court proceedings, the Appellate Division had a very different record than mine, or, at least, the parties have not directed me to any portions of my record in connection with the judicial estoppel or Cameron issues. Because Woo was unaware of any allegations of sexual abuse or excessive corporal punishment at the time he removed the children, he did not rely on such evidence in his decision to remove them. There was therefore no mention in the trials before me of sexual abuse (other than as noted in fn. 5, supra), corporal punishment of children, nor of the specifics of Family Court factual findings on those issues.

The doctrine of judicial estoppel bars a party from asserting a position in a later litigation that is inconsistent with his position in an earlier litigation. See Mitchell v. Washingtonville Cent. Sch. Dist., 190 F.3d 1, 6 (2d Cir. 1999). The Supreme Court set out some non-exclusive considerations for applying the doctrine in New Hampshire v. Maine, 532 U.S. 742, 750-51,121 S. Ct. 1808, 1815:

---

[6] The disappearance of the transcript has always been enigmatic in this case, particularly because the Appellate Division was asked to review the sufficiency of the evidence before Judge Ambrosio. The record on appeal before the Appellate Division should, therefore, have contained the transcript.

First, a party's later position must be "clearly inconsistent" with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create "the perception that either the first or the second court was misled" . . . . A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

(Citations omitted). The purpose of judicial estoppel is to "preserve the sanctity of the oath by demanding absolute truth and consistency in all sworn positions" and to "protect judicial integrity by avoiding the risk of inconsistent results in two proceedings." Bates v. Long Island R.R. Co., 997 F.2d 1028, 1037 (2d Cir. 1993). Moreover, "[b]ecause the rule is intended to prevent 'improper use of judicial machinery,' judicial estoppel 'is an equitable doctrine invoked by a court at its discretion.'" New Hampshire v. Maine, 532 U.S. at 750, 121 S. Ct. at 1815 (citations omitted).

Judicial estoppel would be ill-advised here. It does not appear that any of the plaintiff children testified in the Family Court proceedings (Ciara Manning apparently testified, but she is not a plaintiff). The only evidence of statements to the Family Court from the children is the summary of the hearsay testimony of Woo in the Guardian's brief, in which Woo testified to his interviews with the children concerning their alleged abuse.

More fundamentally, it is the position of the Guardian, rather than the children themselves (because, of course, as minors, they were legally prohibited from taking a position), which Woo contends forms the basis for equitable estoppel. Putting aside whether statements by a guardian should ever in equity bind minor children so as to prevent a § 1983 action, we can tell, even without much of a record, that the matter in which the Guardian represented the children before Judge Ambrosio and Judge Lauria was materially different from the instant case. Judge Ambrosio had no occasion to consider whether emergency circumstances existed on the

night that Woo removed the children; whatever hearings were held before him pertained to allegations of sexual abuse and corporal punishment that played no role in Woo's removal decision. The Guardian was not appointed to inquire into or litigate the circumstances of their removal without court order, but to determine their future custody. I see no equity in binding children to a position in a matter that has such significant distinctions from their subsequent litigation based on positions taken by their guardian in the earlier proceeding. Even if the children are legally bound by those positions, judicial estoppel, as noted above, is an equitable doctrine.

A complicating factor is that the hearing before Judge Turbow, four days after the seizure, presumably did consider Woo's allegations of emergency circumstances and extended the seizure based on what was presented there. But that was not a proceeding of record and we do not know exactly what happened. It does not appear that there was any guardian for the plaintiff children, other than ACS in its *parens patriae* role, and so the plaintiff children took no position which could form the basis of an estoppel. Since the children had no position, the proceedings before Judge Turbow meet none of the criteria for judicial estoppel set forth in New Hampshire v. Maine.

## III.  Cameron v. Fogarty

Seizing upon one point from one of the dissents from the denial of a rehearing *en banc* in Southerland I, Woo contends that I should apply by analogy Cameron v. Forgarty, 806 F.2d 380, 388-89 (2d Cir. 1986), to find that plaintiffs are precluded from maintaining this action because of the result reached by the state courts. In Cameron, the Second Circuit held that a convicted felon cannot challenge the existence of probable cause that led to his arrest in a §1983 action. In essence, Woo contends that the Family Court proceedings are the equivalent of state court

criminal proceedings, and its determinations should therefore receive the same recognition in a §1983 action as criminal court proceedings.

At the outset, I would note that the state court proceedings, under the instructions I gave the jury, could have had a potentially material impact on the jury's verdict. On the issue of damages, I instructed the jury that it could only award damages from the time of the removal until the Family Court determination that the children had to remain in foster care. In my view, the Family Court's determination to continue the plaintiff children's separation absolved Woo of any liability for damages suffered by plaintiffs after that date, because the separation at that point was due to the Family Court's order, not Woo's decision to remove the children. Cf. Jaegly v. Couch, 439 F.3d 149, 154 (2d Cir. 2006) ("A cause of action for false arrest accrues at the time of detention, and damages for that claim cover the time of detention up until issuance of process or arraignment, but not more.") (internal quotation marks and citation omitted). However, plaintiffs disputed what had occurred in Family Court before Judge Turbow, and Woo introduced only the computer printout as evidence of that. I therefore further instructed the jury that it had to determine on what date the Family Court had continued the separation, and not award any damages for the period beyond that date.[7]

Like his judicial estoppel point, Woo is not entirely clear as to the portion of the state court proceedings upon which he is relying. It appears he is primarily relying on that portion of the proceedings that occurred before Judge Turbow. His brief makes the following assertion:

> By similar reasoning [to Cameron], plaintiffs' Fourth Amendment claims should be dismissed as a matter of law because, once it was determined by the Family Court that the children were sufficiently at risk . . . as to warrant removal by an

---

[7] I gave a somewhat different instruction in the first trial. There, I instructed the jury that it could award damages for the effects of the children's removal by Woo that continued beyond the date of the court order extending their removal, but that it had to separate those damages from any damages suffered by reason of the extension. In the second trial, I decided that this instruction was speculative and that plaintiffs' damages had to be confined to the period prior to the court's determination to extend the removal.

order issued a mere four days after the emergency removal was effectuated [this is apparently a reference to the proceedings before Judge Turbow], the question of whether exigent circumstances existed at the time of removal became essentially moot – and, moreover, cannot reasonably be disputed given the subsequent finding of Family Court [apparently a reference to Judge Ambrosio's Order], affirmed by the Appellate Division . . . .

It makes some sense for Woo to rely primarily on Judge Turbow's order, since that proceeding, at least presumably (again, we have no adequate record of those proceedings), dealt with whether the conditions in the apartment were sufficient to justify immediate removal. But the analogy to Cameron breaks down both factually and legally for the reasons discussed below.

First, it is hard to equate any aspect of the Family Court proceedings under New York law with a criminal court felony conviction. The proceeding is civil, not criminal. The standard of proof, therefore, is a preponderance of the evidence. N.Y. Fam. Ct. Act §§ 1046(b), 1051(d). There is no right to a jury trial. In the Matter of Ulster County Dept. of Social Services, No. 286-93W, 1995 WL 519189, at *5 (N.Y. Fam. Ct. N.Y.C. Mar. 24, 1995). The exclusionary rule does not apply. See Matter of Anne BB., 202 A.D.2d 806, 808, 609 N.Y.S.2d 111, 113 (3rd Dep't 1994). The hearsay statements of the subject child are admissible. See N.Y. Fam. Ct. Act § 1046(a)(vi). None of the privileges recognized at common law are recognized in Family Court. Id. § 1046(a)(vii). Untreated drug addiction or alcoholism (although that was not an issue in this case) is itself sufficient to constitute a *prima facie* case of abuse. Id. § 1046(a)(iii).

Second, the application of Cameron to the facts of this case is particularly inappropriate. As shown above, Woo appears to rely primarily on the proceedings before Judge Turbow, but we have practically no record of those proceedings. To the extent that he would rely on the subsequent proceedings before Judge Ambrosio, Judge Ambrosio's findings have almost nothing to do with the conditions that Woo found when he decided to remove the children.

This point is important because it is not clear that <u>Cameron</u> would apply to this case even if some portion of the Family Court proceedings were considered the equivalent of criminal proceedings. <u>Cameron</u> states that "the plaintiff can under no circumstances recover if he was convicted of the offense *for which he was arrested*." <u>Cameron</u>, 806 F.2d at 387 (emphasis added). I suppose one could argue (Woo has not, at least not expressly) that the children were removed because of Southerland, Sr.'s abuse and he was found "guilty" of abusing the children. But that is a rather crabbed description of what happened. The children were removed because Woo thought that Southerland, Sr. had neglected their essential needs; Judge Turbow appears to have agreed on some basis that we can discern only by inference; and Judge Ambrosio found a year later that Southerland, Sr. had sexually abused Ciara Manning and physically abused the plaintiff children. By the time this matter reached Judge Ambrosio, it presented a very different picture than what Woo found when he entered the apartment. I cannot see how <u>Cameron</u> would apply under those circumstances.

This is further confirmed by the Supreme Court's post-<u>Cameron</u> decision in <u>Heck v. Humphrey</u>, 512 U.S. 477, 114 S. Ct. 2364 (1994). That decision precludes a §1983 action only if it "necessarily" requires a plaintiff to prove the invalidity of his prior conviction. For the reason described above, allowing any of the plaintiffs to prevail in this case would not necessarily undermine Judge Ambrosio's order.

Finally, it should be noted that although Woo argued that all of the plaintiffs' claims should be dismissed through his proposed <u>Cameron</u> analogy, the argument has no merit at all as applied to the plaintiff children. They have been "convicted" of nothing, and have engaged in no wrongdoing.

## CONCLUSION

Upon the verdict of the jury and this decision, the Clerk is directed to enter judgment against defendant in the amount of $10,000 in favor of plaintiff Sonny Southerland, Sr., and $75,000 each in favor of plaintiffs Sonny Southerland Jr., Venus Southerland, Nathaniel Southerland, Kiam Felix, and Elizabeth Felix.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
       September 10, 2014